# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| CLEVELAND BAKERS AND TEAMSTERS HEALTH & WELFARE FUND, Individually and on Behalf of All Others Similarly Situated,<br><br>                  Plaintiff,<br><br>v.<br><br>MCKINSEY & COMPANY, INC., and MCKINSEY & COMPANY, INC. UNITED STATES<br><br>                  Defendants. | Civil Action No. 1:21-cv-1218<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED |

# CLASS ACTION COMPLAINT

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................ 3

II.   PARTIES ........................................................................................................... 4

III.  JURISDICTION AND VENUE ........................................................................ 5

IV.   FACTUAL ALLEGATIONS ............................................................................ 6

      A.    McKinsey's Business Model: "Consulting Is More than Giving Advice" .............. 7

      B.    Purdue Pleaded Guilty to Misbranding and Entered Into a Corporate Integrity
            Agreement ........................................................................................................... 9

      C.    Purdue and the Sacklers Ignored the Constraints of the Corporate Integrity
            Agreement and Hire McKinsey to Boost Opioid Sales ................................... 11

            1.    The Sacklers Nominally Distanced Themselves from Purdue While
                  Still Working to Maximize the Money They Would Make from
                  OxyContin and Generic Opioid Sales ........................................................ 11

            2.    Purdue Hired McKinsey to Devise and Implement an OxyContin Sales
                  Strategy Consistent with the Sacklers' Goals ............................................ 13

      D.    Purdue Relies on McKinsey and Their Transformational Relationship ................. 15

            1.    McKinsey Delivers and Executes a Plan to Increase OxyContin Sales ..... 18

            2.    Granular Growth ...................................................................................... 18

2.    "Identifying Granular Growth Opportunities for OxyContin" ................................ 19

            a.    Marketing – Countering Emotional Messages ............................... 20

            b.    Target-Selling More OxyContin to Existing High Prescribers ...... 22

            c.    Titration – Selling Higher Doses of OxyContin ............................ 24

            d.    Covered Persons – Sales Quotas and Incentive Compensation ..... 24

            e.    Increasing the Overall Size of the Opioid Market: the Larger the
                  Pie, the Larger the Slice ............................................................... 26

      E.    Purdue Implements McKinsey's Strategies, Including Project Turbocharge ......... 28

            1.    Project Turbocharge .................................................................................. 29

      F.    McKinsey's Efforts Triple OxyContin Sales .......................................................... 33

i

G.    McKinsey Developed and Helped Implement a Plan to Increase OxyContin Prescriptions Despite Knowing about the Corporate Integrity Agreement and the Dangers of Opioids. ...................................................................................... 34

H.    Guilty Again: Purdue's 2020 Guilty Plea and McKinsey's Statement. ................. 43

I.    Impact of McKinsey and Purdue's Conduct: ............................................. 46

J.    The Opioid Marketing Enterprise ........................................................ 47

    1.    The Common Purpose and Scheme of the Opioid Marketing Enterprise .. 47

    2.    The Conduct of the Opioid Marketing Enterprise Violated Civil RICO ... 49

    3.    Pattern of Racketeering Activity ................................................ 50

V.   TOLLING OF THE STATUTE OF LIMITATIONS ............................................ 54

VI.   CLASS ACTION ALLEGATIONS ........................................................ 56

VII.  CLAIMS FOR RELIEF .................................................................. 59

    A.    COUNT ONE: VIOLATION OF RICO, 18 U.S.C. § 1961, *et seq.* ...................... 59

    B.    COUNT TWO — UNJUST ENRICHMENT ......................................... 67

VIII. JURY DEMAND ...................................................................... 68

IX.   PRAYER FOR RELIEF ................................................................. 68

# I.   INTRODUCTION

1.      On May 10, 2007, John Brownlee, United States Attorney for the Western District of Virginia, announced the guilty plea of the Purdue Frederick Company, the parent of Purdue Pharma, L.P., relating to the misbranding of OxyContin. Brownlee stated:

> Even in the face of warnings from health care professionals, the media, and members of its own sales force that OxyContin was being widely abused and causing harm to our citizens, Purdue, under the leadership of its top executives, continued to push a fraudulent marketing campaign that promoted OxyContin as less addictive, less subject to abuse, and less likely to cause withdrawal. In the process, scores died as a result of OxyContin abuse and an even greater number of people became addicted to OxyContin; a drug that Purdue led many to believe was safer, less subject to abuse, and less addictive than other pain medications on the market.

McKinsey, one of the world's largest consulting companies advised Purdue and other manufacturers to target prescribers who write the most prescriptions, for the most patients, and thereby make the most money. McKinsey sold its ideas to Purdue for more than a dozen years, from 2004 to 2018, including before and after Purdue's 2007 guilty plea for felony misbranding. Together Purdue and McKinsey moved to implement McKinsey's plans to "Turbocharg[e] Purdue's Sales Engine."  McKinsey partners participated as part of an Executive Oversight Team and Project Management Office, reporting to Purdue's Executive Committee, the Purdue board, and with the Sacklers, individually. McKinsey, working side by side with Purdue, helped implement the plan,  assisting with sales representative training, productivity, messaging, and call plans, IT systems, promotional strategies, and market forecasting. This plan significantly increased Purdue's opioid sales, in particular, for OxyContin.

2.      Along with the guilty plea, Purdue agreed to a Corporate Integrity Agreement with the Office of Inspector General of the U.S. Department of Health and Human Services. For a

period of five years, ending in 2012, Purdue was obligated to retain an Independent Monitor and submit annual compliance reports regarding its marketing and sales practices and training of sales representatives vis-à-vis their interactions with health care providers.

3.      In the wake of Purdue's accession to the Corporate Integrity Agreement, Purdue faced newly-imposed constraints on its sales and marketing practices. The Corporate Integrity Agreement was a problem to solve. Despite the agreement's constraints (*e.g.*, do not lie about OxyContin), Purdue and its controlling owners, the Sackler family, still intended to maximize OxyContin sales.

## II.      PARTIES

4.      Plaintiff Cleveland Bakers and Teamsters Health & Welfare Fund ("Plaintiff") is a multi-employer trust fund established to provide health and welfare benefits to collectively bargained members represented by Bakers' Union Local No. 19 and Teamsters Local No. 507. Plaintiff's principal place of business is located at 9665 Rockside Road, Valley View, Ohio 44125. Plaintiff paid or incurred costs for prescription opioid drugs manufactured, marketed, sold, or distributed by Purdue and the other Opioid Marketing Enterprise Defendants, for purposes other than resale (intended for consumption by its covered participants, their dependents, and covered retirees), and incurred costs for treatment related to the misuse, addiction and/or overdose of opioid drugs during the class period. Given its participants' past history of purchases of opioids and need for medical care resulting from opioid abuse or addiction, Plaintiff anticipates that it will continue to purchase and/or provide reimbursement for opioids and/or incur costs for opioid-related treatment in the foreseeable future.

5.      The distribution and diversion of opioids into Ohio created the foreseeable opioid crisis and opioid public nuisance for which Plaintiff here seeks relief.

6.      Plaintiff directly and foreseeably sustained all economic damages alleged herein.

4

Defendants' conduct has exacted a financial burden for which Plaintiff seeks relief. These damages have been suffered, and continue to be suffered directly, byPlaintiff.

7.      Plaintiff also seeks the means to abate the epidemic created by Defendants' wrongful and/or unlawful conduct.

8.      Plaintiff has standing to bring an action for the opioid epidemic nuisance created by Defendants.

9.      Plaintiff has standing to recover damages incurred as a result of Defendant McKinsey's actions and omissions. Plaintiff has standing to bring all claims pled herein, including, inter alia, to bring claims under the federal RICO statute, pursuant to 18 U.S.C. §1961(3) ("persons" include entities which can hold legal title to property) and 18 U.S.C. §1964 ("persons" have standing).

10.      Defendant McKinsey & Company, Inc., United States ("McKinsey US") is a corporation organized under the laws of the state of Delaware with its principal place of business located at 711 Third Avenue, 4th Floor, New York, New York 10017.

11.      Defendant McKinsey & Company, Inc. ("McKinsey Inc.") is a corporation organized under the laws of the state of Delaware with its principal place of business located at 711 Third Avenue, 4th Floor, New York, New York 10017.

12.      McKinsey US and McKinsey Inc. are referred to in this Complaint together as "McKinsey" or "Defendant." McKinsey is a management consulting firm founded by James O. McKinsey in 1926. McKinsey today has over 30,000 employees and operates in more than 65 countries.

### III.      JURISDICTION AND VENUE

13.      This Court has federal question subject matter jurisdiction arising out of

Plaintiff's RICO claims pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1961, *et seq.* and has supplemental jurisdiction over the Plaintiff's state law claims pursuant to 28 U.S.C. § 1367. This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action in which the aggregate amount in controversy exceeds $5,000,000 (exclusive of interest and costs), the number of the members of the Class exceeds 100, and at least one member of the putative Class is a citizen of a state different from that of one of the defendants.

14.     This Court has personal jurisdiction over McKinsey because it conducts business in the State of Ohio, purposefully directs or directed its actions toward Ohio, and/or has the requisite minimum contacts with Ohio necessary to permit the Court to exercise jurisdiction. This Court also has personal jurisdiction over McKinsey because Plaintiff's claims arise out of, or relate to, McKinsey's contacts with the State of Ohio.

15.     At all times relevant hereto, McKinsey engaged in the business of researching, designing, and implementing marketing and promoting strategies for various opioid manufacturers, including Purdue, that were intended to be, and were, implemented in, or whose implementation had a substantial and intended effect in the State of Ohio, among other places.

16.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) in that a substantial part of the events or omissions giving rise to the claims occurred in the Northern District of Ohio.

### IV.     FACTUAL ALLEGATIONS

17.     This lawsuit concerns McKinsey's work for Purdue and its owner, the Sackler family, beginning at least as early as 2004, and in particular McKinsey's work in the years after the 2007 guilty plea relating to Purdue's sales and marketing strategy for its opioids.

18.     McKinsey had an ongoing relationship with Purdue beginning at least as early as 2004 and lasting decades. By June 2009, McKinsey was advising Purdue on precisely the same

sales and marketing strategy and practices for OxyContin that were the subject of the Corporate Integrity Agreement. McKinsey continued this work after the expiration of the Corporate Integrity Agreement and at least through November of 2017.

## A.    McKinsey's Business Model: "Consulting Is More than Giving Advice"

19.     Management consulting is the business of providing solutions to clients. Solutions take many forms, depending on the client's needs. "Management consulting includes a broad range of activities, and the many firms and their members often define these practices quite differently."[1]

20.     Broadly speaking, there are two schools of management consulting. "Strategy" consulting provides big-picture advice to clients about how they approach their business: how the business is structured, which markets to compete in, potential new business lines, and mergers and acquisitions. The strategy consultant would provide a plan to the client that the client may choose to adopt or not.

21.     "Implementation" consulting is what comes next. If strategy consulting is providing advice to a client, "implementation" work is what happens once the client has adopted the consultant's plan. After a client has adopted the strategy consultant's recommendations, the implementation consultant remains in place with the client to actually do the necessary work and execute on the plan.

22.     In his 1982 Harvard Business Review article entitled "Consulting is More Than Giving Advice," Professor Arthur Turner of the Harvard Business School described the then-current state of the consulting industry's attitude toward implementation work: "The consultant's proper role in implementation is a matter of considerable debate in the profession. Some argue that one who helps put recommendations into effect takes on the role of manager and thus

---

[1] Arthur Turner, *Consulting is More Than Giving Advice*, HARV. BUS. REV. (Sept. 1982), https://hbr.org/1982/09/consulting-is-more-than-giving-advice.

exceeds consulting's legitimate bounds. Others believe that those who regard implementation solely as the client's responsibility lack a professional attitude, since recommendations that are not implemented (or implemented badly) are a waste of money and time. And just as the client may participate in diagnosis without diminishing the value of the consultant's role, so there are many ways in which the consultant may assist in implementation without usurping the manager's job."[2]

23.     A core component of the McKinsey relationship is discretion. "The basis of any client relationship with the firm is trust. Companies share their most competitive secrets with McKinsey with the understanding that confidentiality is paramount. McKinsey consultants aren't even supposed to tell their own spouses about their client work."[3]

24.     Although McKinsey has historically been regarded as a "strategy" consulting firm, by the time it was working with Purdue, implementation services were a core component of the overall suite of services that McKinsey provided within the "transformational relationship" McKinsey developed with its clients.[4]

25.     Describing McKinsey's approach to implementation, one McKinsey consultant stated, "On some of the most successful engagements I've seen, you can't even tell the difference between a McKinsey team member and one of our clients because we're working that cohesively together."[5]

26.     Another McKinsey Senior Implementation Coach described McKinsey's

---

[2] *Id.*

[3] Duff McDonald, *The Firm, The Story of McKinsey and its Secret Influence on American Business*, at 308, Simon and Schuster (Sept. 30, 2014).

[4] For McKinsey's own description of its implementation services, *see* https://www.mckinsey.com/business-functions/mckinsey-accelerate/how-we-help-clients/implementation

[5] McKinsey on Implementation, YOUTUBE (Apr. 30, 2017), https://www.youtube.com/watch?v=rEQOGVpl9CY.

approach: "We're in there interacting with every element of that organization, from the welders or mechanics on the front line, all the way up to the board of directors."[6]

27.     To put it simply, McKinsey's business model, as a provider of strategy and implementation consulting services, is to partner with clients to pursue business objectives identified by McKinsey. Once the objective is identified, the client and McKinsey then engage in concerted action as a seamless and cohesive unit in order to implement the necessary means to achieve those objectives for the client.

28.     As described below, after McKinsey provided advice to Purdue about what Purdue should do, McKinsey remained with Purdue to assure proper implementation of McKinsey's strategies to maximize OxyContin sales.

**B.     Purdue Pleaded Guilty to Misbranding and Entered Into a Corporate Integrity Agreement**

29.     Purdue is the manufacturer of OxyContin, among other opioids. OxyContin is a Schedule II opioid agonist tablet of pure oxycodone first approved in 1995 and the product whose launch in 1996 ushered in the modern opioid epidemic. Purdue initially made it available in the following strengths: 10 mg, 15 mg, 20 mg, 30 mg, 40 mg, 60 mg, 80 mg, and 160 mg. The weakest OxyContin delivers as much narcotic as the strongest Percocet, and some OxyContin tablets delivered sixteen times that. OxyContin is currently indicated for the management of pain severe enough to require daily, around-the-clock, long-term opioid treatment and for which alternative treatment options are inadequate.

30.     Purdue is owned by members of the Sackler family and was for many years led by its Board Director and former President, Dr. Richard Sackler. The Sackler family has owned and controlled Purdue and its predecessors since 1952. At all times relevant to this Petition,

---

[6] *Id.*

individual Sackler family members occupied either six or seven of the seats on Purdue's board of directors, and at all times held a majority of board seats. To advise the board of directors of Purdue was to advise the Sackler family.

31.     Richard Sackler had grand ambitions for the company; according to a long-time Purdue sales representative, "Richard really wanted Purdue to be big—I mean *really* big."

32.     On May 10, 2007, the Purdue Frederick Company, Purdue's parent, as well as three of Purdue's officers, pleaded guilty to the misbranding of OxyContin pursuant to various provisions of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301, *et seq.*

33.     Purdue admitted that "supervisors and employees, with the intent to defraud or mislead, marketed and promoted OxyContin as less addictive, less subject to abuse and diversion, and less likely to cause tolerance and withdrawal than other pain medications."[7]

34.     Concurrent with the 2007 guilty plea by the Purdue Frederick Company, Purdue entered into a Corporate Integrity Agreement with the Office of Inspector General of HHS on May 7, 2007.

35.     Purdue's compliance obligations under the Corporate Integrity Agreement ran for a period of five years, expiring on May 10, 2012.

36.     Pursuant to the Corporate Integrity Agreement, Purdue was obligated to implement written policies regarding its compliance program and compliance with federal health care program and Food and Drug Administration requirements, including:

> selling, marketing, promoting, advertising, and disseminating
> Materials or information about Purdue's products in compliance
> with all applicable FDA requirements, including requirements
> relating to the dissemination of information that is fair and
> accurate … including, but not limited to information concerning

---

[7] Information at pp. 5-6, *United States v. Purdue Frederick Co.*, No. 1:07-cr-00029-JPJ(W.D. Va. May 10, 2007), Dkt. # 5.

the withdrawal, drug tolerance, drug addiction or drug abuse of Purdue's products;

compensation (including salaries and bonuses) for Relevant Covered Persons engaged in promoting and selling Purdue's products that are designed to ensure that financial incentives do not inappropriately motivate such individuals to engage in the improper promotion or sales of Purdue's products;

the process by which and standards according to which Purdue sales representatives provide Materials or respond to requests from HCP's [health care providers] for information about Purdue's products, including information concerning withdrawal, drug tolerance, drug addiction, or drug abuse of Purdue's products," including "the form and content of Materials disseminated by sales representatives," and "the internal review process for the Materials and information disseminated by sales representatives."

37.     Purdue was obligated to engage an Independent Review Organization to ensure its compliance with the strictures of the Corporate Integrity Agreement, and to file compliance reports on an annual basis with the inspector general.

**C.     Purdue and the Sacklers Ignored the Constraints of the Corporate Integrity Agreement and Hire McKinsey to Boost Opioid Sales**

**1.          The Sacklers Nominally Distanced Themselves from Purdue While Still Working to Maximize the Money They Would Make from OxyContin and Generic Opioid Sales**

38.     After the 2007 guilty plea, the Sackler family began to reassess its involvement in the opioid business. On April 18, 2008, Richard Sackler, then the co-chairman of the board of directors along with his uncle, communicated to other family members that Purdue's business of selling OxyContin and other opioids was "a dangerous concentration of risk." Richard Sackler recommended a strategy of installing a loyal CEO of Purdue who would safeguard the interests of the Sackler family, while at the same time positioning Purdue for an eventual sale by maximizing OxyContin sales.

39.     In the event that a purchaser for Purdue could not be found, Richard Sackler

stated that Purdue should "distribute more free cash flow" to the Sacklers. Such distributions would allow the Sacklers to diversify their assets and make their wealth less vulnerable to judgments regarding Purdue's sales and marketing of opioids, including OxyContin. In the years after the 2007 guilty plea, Purdue would retain only the absolute minimum amount of money within Purdue as possible: $300 million. That amount was required to be retained by Purdue pursuant to a partnership agreement with separate company. Otherwise, all the money was distributed to the owners.[8]

40. Concurrently, the Sacklers backed away from day-to-day jobs at Purdue. During the ongoing investigation that resulted in the 2007 guilty pleas, "several family members who worked at Purdue stepped back from their operational roles." In 2003, Richard Sackler himself resigned as the president to assume his role of co-chairman. Dr. Kathe Sackler and Jonathan Sackler chose to exit their roles as senior vice presidents. Mortimer D.A. Sackler quit being a vice president. They remained on the board of directors, however.

41. Consistent with the advice of Richard Sackler, the Sacklers appointed John Stewart as the CEO of Purdue in 2007. The Sacklers viewed Stewart as someone loyal to the family. He had previously worked for a division of Purdue in Canada. Stewart's job was to assist the Sacklers with the divestiture or eventual orderly wind-down of Purdue. Stewart was paidmore than $25 million for his services to Purdue from 2007 through 2013.

42. At the time Richard Sackler communicated these plans to distance the family from Purdue, the Sacklers had already established a second company, Rhodes Pharmaceuticals L.P. The Sacklers established Rhodes four months after the 2007 guilty plea. Rhodes' purpose

---

[8] *See* Jared S. Hopkins, *At Purdue Pharma, Business Slumps as Opioid Lawsuits Mount*, Wall St. J. (updated June 30, 2019, 6:15 PM), https://www.wsj.com/articles/purdue-pharma-grapples- with-internal-challenges-as-opioid- lawsuits-mount-11561887120.

was to sell generic versions of opioids. It was, in other words, a way for the Sacklers to continue to make money off of opioids while separating themselves from Purdue. By 2016, Rhodes held a larger share of the opioid market than Purdue. Through Purdue, the Sacklers controlled 1.7% of the overall opioid market. When combined with Rhodes, however, the Sacklers' share of the overall opioid market was approximately 6% of all opioids sold in the United States.[9]

## 2.   Purdue Hired McKinsey to Devise and Implement an OxyContin Sales Strategy Consistent with the Sacklers' Goals

43.    The Sacklers faced a problem: either option they were pursing—a sale or significant distributions to shareholders—would require Purdue to increase profitability in the short term. They needed to grow OxyContin sales as dramatically as possible to make Purdue an attractive acquisition target or borrower, while at the same time appearing to comply with the Corporate Integrity Agreement.

44.    As one Purdue executive stated of Purdue's attitude toward the Corporate Integrity Agreement: "They did not listen to their critics and insisted they had just a few isolated problems. After the settlement, they didn't change—the way the sales force was managed and incentivized, everything stayed the same."[10]

45.    Purdue and the Sacklers were well aware of the constraints posed by the Corporate Integrity Agreement. Indeed, during a May 20, 2009 Executive Committee Meeting, the discussion led to whether Purdue should have a single sales force marketing all Purdue products, including OxyContin, or instead to "create a separate Sales Force for Intermezzo (a sleeping pill) that would be comprised of approximately 300 representatives." Stewart, the Sacklers' chosen CEO, saw an opportunity, and asked if the Corporate Integrity Agreement

---

[9] *Id.*

[10] David Crow, *How Purdue's 'One-Two' Punch Fueled the Market for Opioids*, Fin. Times (Sept. 9,

would apply if Purdue were to launch Intermezzo and another Purdue product, Ryzolt (a branded version of Tramadol, another narcotic painkiller), using the separate sales force.

46.     Stewart asked: Might the new drug launch fall outside of the Corporate Integrity Agreement? Purdue's Vice President of Compliance, Bert Weinstein, told him that it would not.[11]

47.     Given the tension between compliance with the Corporate Integrity Agreement and the desire to sell more OxyContin, Purdue needed help.

48.     Ethan Rasiel, a former McKinsey consultant, has described the typical way McKinsey begins working with a client: "An organization has a problem that they cannot solve with their internal resources. That's the most classic way that McKinsey is brought in."[12]

49.     Such was the case with Purdue. Because it did not have the requisite expertise internally to appear to comply with the Corporate Integrity Agreement while driving opioid sales, Purdue hired McKinsey to devise a sales and marketing strategy to increase sales (and therefore increase the money in the Sackler's pockets). Purdue would pay money to McKinsey in exchange for McKinsey telling the company how to sell as much OxyContin as conceivably possible so that the Sacklers could pull cash out of Purdue and invest it into more diversified holdings (and, in the process, potentially shield those dollars from any future criminal or civil amounts due relating to Oxycontin).

50.     Purdue's Executive Committee discussed CEO Stewart's concerns regarding the constraints posed by the Corporate Integrity Agreement on May 20, 2009. Within weeks, McKinsey was working with Purdue to devise and implement new marketing strategies for

---

2018), https://www.ft.com/content/8e64ec9c-b133-11e8- 8d14-6f049d06439c.

[11] *Id.*

[12] *How McKinsey Became One of the Most Powerful Companies in the World*, YOUTUBE (June 6, 2019),

OxyContin.

51.     Stewart, as CEO, was in charge of the relationship with McKinsey. He controlled workflow to and from McKinsey, and required his personal approval for any work orders with McKinsey.

52.     Purdue's Vice President of Corporate Compliance, "responsible for developing and implementing policies, procedures, and practices designed to ensure compliance with the requirements set forth in the [Corporate Integrity Agreement]," reported directly to Stewart.

53.     Throughout their relationship, McKinsey routinely obtained information from, advised, communicated with, and ultimately worked for the Purdue board of directors, controlled by the Sackler family.

54.     McKinsey would also work in granular detail with the Purdue sales and marketing staff, led during the relevant period by Russell Gasdia, Vice President of Sales and Marketing.

55.     From as early as June 2009 and continuing at least through July 14, 2014, Purdue routinely relied upon McKinsey to orchestrate their sales and marketing strategy for OxyContin. The relationship was characterized by ongoing interactions between teams from McKinsey and Purdue regarding not only the *creation* of an OxyContin sales strategy, but also its implementation.

**D.      Purdue Relies on McKinsey and Their Transformational Relationship**

38.     McKinsey is not hired to give casual advice. They are a corporate institution, the elitist of the elite; McKinsey likens itself to the Marines or the Jesuits.[13] United States

---

https://www.youtube.com/watch?v=BBmmMj_maII.

[13] Said one former McKinsey partner to BusinessWeek in 1986: "There are only three great institutions left in the world: The Marines, the Catholic Church, and McKinsey." McDonald, The Firm, at 165.

Senator Mitt Romney, during his presidential campaign in 2012, told the editorial board of the Wall Street Journal that as president he would approach reducing the size of the government by hiring McKinsey. A former consultant himself, Romney stated, "So I would have … at least some structure that McKinsey would guide me to put in place." In response to audience surprise, Romney said, "I'm not kidding. I would probably bring in McKinsey."[14]

56.     McKinsey is not cheap, either. A client does not choose to pay McKinsey unless it expects to receive advice it could not have obtained within its own organization. McKinsey offers solutions to clients facing challenges they feel they cannot adequately address on their own. In 2008, McKinsey's revenue was $6 billion.

57.     McKinsey has long touted the notion of the "transformational relationship." It is the goal of every client relationship McKinsey develops, and, McKinsey argues, the best way to extract value from a client's use of McKinsey's services.

58.     At its core, the "transformational relationship" is long-term. It is the antithesis of a one-off contract wherein McKinsey performs one discreet project for a client and then concludes its business. Rather, "once McKinsey is inside a client, its consultants are adept at artfully creating a feedback loop through their work that purports to ease executive anxiety but actually creates more of it."[15] The long-term result can be "dependence" on the McKinsey consultants.

59.     This strategy of insinuating itself into all aspects of its clients' business proved

---

[14] McDonald, *The Firm,* at 1

[15] *Id.* at 6. Purdue provides a fine example of this feedback loop in action. In 2008, when McKinsey was advising Purdue regarding Risk Evaluation and Mitigation Strategies (REMS) for OxyContin required by the FDA, McKinsey partner Maria Gordian wrote to fellow partners Martin Elling ("Elling") and Rob Rosiello ("Rosiello") regarding progress in the "REMS work" as well as "Broader Strategy work." Regarding the latter, Gordian noted that Purdue board members Jonathan Sackler and Peter Boer "basically 'blessed' [Landau] to do whatever he thinks is necessary to 'save the business.'. . . I believe there is a good opportunity to get another project here." Indeed, after the REMS work was completed, McKinsey continued to work on "Broader Strategy work" for another decade.

enormously successful for McKinsey over the years. It was a strategy McKinsey encouraged its consultants to take with clients to great effect:

> The sell worked: Once ensconced in the boardrooms of the biggest corporate players in the world, McKinsey rarely left, ensuring a steady and growing flow of billings for years if not decades. In 2002, for example, BusinessWeek noted that at that moment, the firm had served four hundred clients for fifteen years or more.[16]

60.   McKinsey's work with Purdue was no different. McKinsey insidiously inserted its consultants into the day-to-day goings on at Purdue and then benefitted from this symbiotic relationship: McKinsey helped bring in money for the Sacklers while simultaneously lining its own pockets. McKinsey counted Purdue as a client at least as early as 2004. The precise duration of the relationship between McKinsey and Purdue and its owners has not been ascertained, although McKinsey worked with Purdue for years before Purdue's parent and officers first pleaded guilty to misbranding OxyContin in 2007, and by June 2009 McKinsey was actively working with Purdue to increase OxyContin sales in light of that guilty plea and its accompanying Corporate Integrity Agreement. The work continued through at least 2018. McKinsey partner Maria Gordian, in her March 26, 2009 "EY 2009 Impact Summary" internal report to McKinsey Director Olivier Hamoir and McKinsey's Personnel Committee, recounted her accomplishments that year on the Purdue account. The document is an annual self-assessment produced by McKinsey partners. In it, Gordian described the state of firm's relationship for Purdue:

> With client work extending through the 3rd quarter, and several additional proposals in progress, we continue to expand the depth and breadth of our relationships at Purdue. We look forward to deepening our relationships with the Sackler family and serving them on key business development

---

[16] *Id.* at 136.

issues, and to expanding our relationship with [John] Stewart
and other members of the seniormanagement team.

61.     McKinsey staffed at least 36 known consultants to Purdue, from senior partners all the way down through engagement managers to entry-level associates. Throughout the unfolding of the nationwide opioid crisis that only continued to worsen after the 2007 guilty plea, McKinsey remained steadfast alongside the Sacklers and Purdue every step of the way. The *mea culpas* would come only later.

**1.          McKinsey Delivers and Executes a Plan to Increase OxyContin Sales**

62.     By 2009, McKinsey was working with its long-time client to craft and implement a sales and marketing plan to increase OxyContin sales in light of the Corporate Integrity Agreement and the diminishing outlook for Purdue.

63.     In June 2009, McKinsey advised Purdue senior management, including Landau, then the Chief Medical Officer ("CMO") and future CEO, regarding a variety of strategies to increase Purdue's opioid sales that were developed using McKinsey's expertise and proprietary approaches to problem solving.

**2.          Granular Growth**

64.     McKinsey prides itself on certain managerial techniques it professes to have detailed knowledge of and expertise in deploying. These techniques are generally applicable to problems encountered by many businesses; they are conceptual frameworks that McKinsey deploys when tasked with solving a problem for a client.

65.     After the first guilty plea, the Sacklers desired dramatic, short-term growth of Purdue's opioid sales so as to increase the company's attractiveness as an acquisition target or borrower while allowing the Sacklers to take money out of the company. One service McKinsey offers to its clients is to tell them how to grow (aka, in consultant-speak, "drive growth opportunities").

66.     In order to identify growth opportunities for a client, McKinsey espouses a "granular" approach to identifying which subsets of the client's existing business are the sources of growth and "exploiting" them for all they are worth. In August 2008, McKinsey Directors Patrick Viguerie and Sven Smit, together with Mehrdad Baghai, published a treatise on the matter: *The Granularity of Growth: How to Identify the Sources of Growth and Drive Enduring Company Performance* (2008). "The key is to focus on granularity, to breakdown big-picture strategy into its smallest relevant components."[17]

67.     Previously, in an article in the McKinsey Quarterly (coincidentally published the same month that Purdue pled guilty), the authors explained:

> Our research on revenue growth of large companies suggest that executives should 'de-average' their view of markets and develop a granular perspective on trends, future growth rates, and market structures. Insights into subindustries, segments, categories, and micromarkets are the building blocks of portfolio choice. Companies will find this approach to growth indispensable in making the right decisions about where to compete.[18]

68.     Additionally, McKinsey encouraged a granular assessment of the geography of corporate growth. "The story gets more precise as we disaggregate the company's performance on the three growth drivers in 12 product categories for five geographic regions."[19]

### 2.     "Identifying Granular Growth Opportunities for OxyContin"

69.     McKinsey's granular analysis of Purdue's OxyContin sales efforts led to the implementation of a number of strategies to sell more pills.

---

[17]     *The Granularity of Growth,* Book Excerpt, McKinsey & Co. (Mar. 1, 2008), https://www.mckinsey.com/business-functions/strategy-and-corporate-finance/our-insights/the-granularity-of-growth.

[18]     Mehrdad Baghai et al., *The Granularity of Growth*, MCKINSEY Q. (May 1, 2007), https://www.mckinsey.com/featured-insights/employment-and-growth/the-granularity-of- growth.

[19] *Id.*

70.     By January 2010, McKinsey informed Purdue that, in accordance with the tenants of its granular growth analysis, Purdue could generate "$200,000,000 to $400,000,000" in additional annual sales of OxyContin by implementing McKinsey's strategies.

71.     In June of 2012, Stewart assigned McKinsey to "understand the significance of each of the major factors affecting OxyContin's sales."

72.     Per its usual SOP, McKinsey completed this task and presented its conclusions in excruciating detail. McKinsey analyzed each sales channel for Purdue's opioids for weaknesses and opportunities. For instance, McKinsey informed the Sacklers that "deep examination of Purdue's available marketing purchasing data shows that Walgreens has reduced its units by 18%." Further, "the Walgreens data also shows significant impact on higher OxyContin doses." In order to counter these perceived problems, McKinsey suggested that Purdue's owners lobby Walgreens specifically to increase sales. It also suggested the establishment of a direct-mail specialty pharmacy so that Purdue could circumvent Walgreens and sell directly to Walgreens' customers. In addition, McKinsey suggested the use of opioid savings cards distributed in neighborhoods with Walgreens locations to encourage the use of Purdue's opioids despite Walgreens actions. That is, McKinsey suggested multiple, very specific ways to thwart apparent efforts by Walgreens to curtail opioid over-prescription and abuse.

73.     The themes of McKinsey's work would be crystallized in a series of presentations and updates made to the Sackler family and Purdue's board of directors in the summer of 2013 entitled "Identifying Granular Growth Opportunities for OxyContin."

### a.     Marketing – Countering Emotional Messages

74.     From the outset of McKinsey's known work for Purdue, the work was grim. In June of 2009, McKinsey teamed with Purdue's CMO (and current CEO) Landau and his staff to discuss how best to "counter emotional messages from mothers with teenagers that overdosed in

[sic] OxyContin."

75.    Months later, McKinsey advised Purdue to market OxyContin based on the false and misleading notion that the drug can provide "freedom" and "peace of mind" for its users, and concomitantly reduce stress and isolation.

76.    These marketing claims were tailored to avoid any pitfalls that the Corporate Integrity Agreement might hold. While nonetheless false and misleading, these claims regarding "freedom" and "peace of mind" of OxyContin users were narrowly tailored in order to avoid representations regarding "the withdrawal, drug tolerance, drug addiction or drug abuse of Purdue's products," as specified in Section III.B.2.c of the Corporate Integrity Agreement.

77.    Purdue's marketing materials from that time period are illustrative of the approach.[20]



---

[20] *State of Tenn. v. Purdue Pharma L.P.*, No. 1-173-18, Complaint at ¶24 (Tenn. Cir.Ct. May 15, 2018).

78.     In addition, McKinsey suggested the tactic of "patient pushback," wherein McKinsey and Purdue would foment *patients* to directly lobby their doctors for OxyContin when those physicians expressed reservations regarding the administration of Purdue's opioids.

### b.     Target-Selling More OxyContin to Existing High Prescribers

79.     Perhaps the key insight McKinsey provided was, using its granular approach, to identify historically large prescribers and target ever more sales and marketing resources on them.

80.     On January 20, 2010, Purdue's board of directors was informed of the ongoing work McKinsey was performing concerning a new "physician segmentation" initiative whereby McKinsey would analyze the opioid prescribing patterns of individual physicians to identify those that had historically been the highest prescribers. McKinsey then worked with Purdue's sales and marketing staff to specifically target those prescribers with a marketing blitz to encourage even further prescribing.

81.     Purdue trained its sales force in tactics to market to these high prescribers based on McKinsey's insights and designed in conjunction with McKinsey.

82.     Many of the historically highest prescribers of OxyContin – those same individuals that McKinsey urged Purdue to target for ever more prescriptions – had prescribed Purdue's OxyContin before the 2007 guilty plea, and had already been subjected to Purdue's misrepresentations regarding OxyContin that were the subject of that guilty plea.

83.     McKinsey identified these physicians – those that had already been influenced by Purdue's misrepresentations and were thus already high prescribers – as optimal targets for a massive marketing push to sell more OxyContin.

84.     McKinsey worked hand-in-hand with Purdue over many years to continually refine this approach, and required ever-more granular data for its analysis. More than three years

after the initial introduction of the physician segmentation initiative, McKinsey requested, and Purdue provided, "prescriber-level milligram dosing data" so that they could further analyze the individual amounts of OxyContin prescribed by individual physicians.

85.     At the same time, it requested this "prescriber-level milligram dosing data" from Purdue, McKinsey urged the Sacklers to strictly manage the target lists of each sales representative to assure that the maximum amount of each sales representative's time was spent with the most attractive customers.

86.     On July 23, 2013, Purdue's board of directors discussed concerns about "the decline in higher strengths" of Purdue's opioids as well as an observed decline in "tablets per Rx." In order to assure that the threat to OxyContin sales growth be addressed, McKinsey was assigned "to actively monitor the number and size of opioid prescriptions written by individual doctors."

87.     In unveiling of Project Turbocharge to Purdue and the Sacklers, McKinsey stated that the most prolific OxyContin prescribers wrote "25 times as many OxyContin scripts" as less prolific prescribers, and urged Purdue and the Sacklers to "make a clear go-no go decision to 'Turbocharge the Sales Engine'" by devoting substantial capital toward McKinsey's plan.

88.     McKinsey also stated that increased numbers of visits by sales representatives to these prolific prescribers would increase the number of opioid prescriptions that they would write.

89.     By November 2013, McKinsey had obtained the physician-level data they had previously requested, and continued to study ways to sell additional OxyContin prescriptions by refining and targeting the sales pitch to them. The Purdue board of directors was kept apprised of McKinsey's progress.

### c.      Titration – Selling Higher Doses of OxyContin

90.     McKinsey understood that the higher the dosage strength for any individual OxyContin prescription, the greater the profitability for Purdue. Of course, higher dosage strength, particularly for longer periods of use, also contributes to opioid dependency, addiction, and abuse. Nonetheless, McKinsey advised Purdue to focus on selling higher strength dosages of OxyContin.

91.     Consistent with its granular growth analysis, as early as October 26, 2010 McKinsey advised the Sacklers and the Purdue board of directors that Purdue should train its sales representatives to "emphasiz[e] the broad range of doses," which would have the intended effect of increasing the sales of the highest (and most profitable) doses of OxyContin.

92.     McKinsey's work on increasing individual prescription dose strength continued throughout the time period McKinsey worked with Purdue. The Sacklers were informed on July 23, 2013, that Purdue had identified weakness in prescribing rates among the higher doses of OxyContin, and reassured the Sacklers that "McKinsey would analyze the data down to the level of individual physicians" in order to study ways to maximize the sales of the highest-dose OxyContin pills.

93.     Purdue implemented McKinsey's suggestions through adopting the marketing slogan to "Individualize the Dose," and by 2013 encouraged its sales representatives to "practice verbalizing the titration message" when selling Purdue's opioids to prescribers.

### d.      Covered Persons – Sales Quotas and Incentive Compensation

94.     McKinsey urged the use of quotas and bonus payments to motivate the sales force to sell as many OxyContin prescriptions as possible.

95.     Notably, this behavior was contemplated by the 2007 Corporate Integrity Agreement, which required Purdue to implement written policies regarding "compensation

(including salaries and bonuses) for [sales representatives] engaged in promoting and selling Purdue's products that are designed to ensure that financial incentives *do not inappropriately motivate such individuals to engage in the improper promotion or sales of Purdue's products.*" (emphasis added).

96.    By 2010, Purdue had implemented a four-year plan, consistent with McKinsey's strategy, to dramatically increase the quota of required annual sales visits by Purdue sales representatives to prescribers. The quota was 545,000 visits in 2010; 712,000 visits in 2011; 752,000 in 2012; and 744,000 visits in 2013.

97.    On August 8, 2013, as part of their "Identifying Granular Growth Opportunities for OxyContin" presentation, McKinsey urged the Sacklers to "establish a revenue growth goal (e.g., $150M incremental stretch goal by July 2014) and set monthly progress reviews with CEO and Board."

98.    In its "Identifying Granular Growth Opportunities for OxyContin" presentation to the Purdue board of directors in July 2013, McKinsey nonetheless urged Purdue, in addition to increasing the focus of the sales force on the top prescribers, to also increase the overall quotas for sales visits for individual sales representatives from 1,400 to 1,700 annually.

99.    In 2013, McKinsey identified one way that Purdue could squeeze more productivity out of its sales force: by slashing one third of the time that Purdue devoted to training its sales force (from 17.5 days per year to 11.5 days):



One possible way to attain benchmark ~1500 calls per year is to **decrease training days by ~6 days and increase calls per day by 5%**   One possible route to benchmark

| Current call activity | | Potential new allocation | |
|---|---|---|---|
| **Number of "on territory" days per year** | | **Number of "on territory" days per year** | |
| **Item** | **Days¹** | **Item** | **Days¹** |
| Number of working days | 260 | Number of working days | 260 |
| Holidays | -11.3 | Holidays | -11.3 |
| Vacation and other time off | -27.2 | Vacation and other time off | -27.2 |
| Trainings and meetings | -17.5 | Trainings and meetings | -11.5 |
| Other company-related  time off of field | -4.3 | Other company-related time off of field | -4.3 |
| **Total days** | 199.7 | **Total days** | 205.7 |
| Avg calls per day | x      7 | Avg calls per day | x    7.35 |
| **Total calls per year** | 1398 | **Total calls per year** | 1512 |

1 Purdue 2012 Actual data was used for this analysis

SOURCE: Purdue; team analysis                                                                    McKinsey & Company | 59

100.     By eliminating one third of the amount of time sales representatives were required to be in training, McKinsey projected that Purdue could squeeze an additional 5% of physical calls per day out of its newly less-trained sales force.

101.     Additionally, McKinsey advised Purdue on how to craft incentive compensation for the sales representatives, who were Covered Persons pursuant to the Corporate Integrity Agreement. McKinsey knew that, combined with the strictures of sales quotas and less training for the sales force, bonus/incentive compensation to the sales representatives based on the number of OxyContin prescriptions the representative produced could be a powerful driver of incremental OxyContin sales.

   e.     **Increasing the Overall Size of the Opioid Market: the Larger the Pie, the Larger the Slice**

102.     Consistent with McKinsey's mandate, Purdue incentivized its sales staff "to increase not just sales of OxyContin but also generic versions of extended release oxycodone." Typically, one would not wish to encourage the sales of generic competitors that offer a similar product to your own. If, however, your goal is to position a company so as to look like an

attractive acquisition target, the growth of the overall opioid market is just as important as one's own market share: "Whereas pharma salespeople are usually compensated based on their ability to grow sales of a particular medicine, part of the bonus for Purdue's staff was calculated in relation to the size of the overall market."[21]

103. Notably, this notion that the size of a company's market share is not as important as the size of the overall market in which it competes is a core insight of McKinsey's granular approach to identifying corporate growth opportunities. Describing their authors' conclusions in *The Granularity of Growth*, McKinsey stated, "One of their most surprising conclusions is that increased market-share is seldom a driver of growth. They contend, instead, that growth is driven by where a company chooses to compete: which market segments it participates in … the key is to focus on granularity, to breakdown big-picture strategy into its smallest relevant components."[22]

104. In other words, in implementing McKinsey's plan, "Purdue's marketing force was indirectly supporting sales of millions of pills marketed by rival companies."[23] That included supporting sales of generic opioids sold by the Sackler's new venture at Rhodes and sales of opioids by McKinsey's other clients (including Johnson and Johnson). "It's the equivalent of asking a McDonald's store manager to grow sales of Burger King and KFC," stated a government official with the HHS.[24]

---

[21] *See* David Crow, *How Purdue's 'one-two' punch fueled the market for opioids*, FIN. TIMES (Sept. 9, 2018), https://www.ft.com/content/8e64ec9c-b133-11e8-8d14-6f049d06439c.

[22] *The Granularity of Growth*, Book Excerpt, McKinsey & Co. (Mar. 1, 2008), https://www.mckinsey.com/business-functions/strategy-and-corporate-finance/our-insights/the-granularity-of-growth.

[23] *See* David Crow, *How Purdue's 'one-two' punch fueled the market for opioids,* FIN. TIMES (Sept. 9, 2018), https://www.ft.com/content/8e64ec9c-b133-11e8-8d14-6f049d06439c.

[24] *Id.*

**E.      Purdue Implements McKinsey's Strategies, Including Project Turbocharge**

105.     As early as September 11, 2009, McKinsey told Purdue that it could generate $200 million to $400 million in additional annual sales of OxyContin by implementing McKinsey's strategy based on the opportunities its granular growth analysis had identified. McKinsey reiterated its assurances regarding the hundreds of millions of dollars of additional OxyContin sales on January 20, 2010.

106.     Purdue accepted and, with McKinsey's ongoing assistance, implemented McKinsey's strategies for selling and marketing OxyContin.

107.     For example, in January 2010, Purdue was training its sales and marketing force on the new sales tactics based on a "physician segmentation" initiative that McKinsey urged. The strategy developed as a result of McKinsey's granular analysis of OxyContin sales channels. The initiative sought to identify the most prolific OxyContin prescribers and then devote significant resources towards convincing those high prescribers to continue to prescribe ever more OxyContin, in higher doses, for longer times, to ever more patients.

108.     On January 20, 2010, the Purdue board of directors was informed of the progress in implementing McKinsey's "physician segmentation" initiative.

109.     This collaboration would continue over the course of the relationship between Purdue and McKinsey.

110.     During the time that McKinsey was advising Purdue, Purdue deliberately minimized the importance of the Corporate Integrity Agreement. In 2008, Carol Panara joined the Purdue sales force from rival Novartis. She would stay with the company until 2013, during which time McKinsey was responsible for increasing OxyContin sales at Purdue, and culminating with the implementation of McKinsey's "Project Turbocharge," beginning September 2013.

111.    Ms. Panara stated that the 2007 guilty plea was deliberately minimized by the company in presentations to its sales staff: "They said, 'we were sued, they accused us of mis-marketing, but that wasn't really the case. In order to settle it and get it behind us we paid a fine.' You had the impression they were portraying it as a bit of a witch hunt."[25] (Purdue and its executives paid $634.5 million in fines.)

112.    Consistent with McKinsey's mandate, McKinsey devised methods for sales staff to sell OxyContin to doctors while at the same time maintaining technical compliance with the Corporate Integrity Agreement. Ms. Panara stated that, though she was told she could not flatly claim that OxyContin was better or safer than other opioids, "she was trained to talk about products in ways that implied that it was safer." She might tout OxyContin's 12-hour formulation to a prescriber. "You could say that with a shorter-acting medication that wears off after six hours, there was a greater chance the patient was going to jump their dosing schedule and take an extra one a little earlier. We couldn't say [it was safer], but I remember we were told that doctors are smart people, they're not stupid, they'll understand, they can read between the lines."[26]

**1.        Project Turbocharge**

113.    In 2013, the year after the Corporate Integrity Agreement expired, McKinsey urged a number of transformational sales and marketing tactics that would further boost OxyContin sales. McKinsey described these tactics to the Purdue board of directors in a series of updates entitled "Identifying Granular Growth Opportunities for OxyContin" in July and August of 2013.

114.    McKinsey dubbed their overall sales and marketing strategy for Purdue "Project

---

[25] *See* David Crow, *How Purdue's 'one-two' punch fueled the market for opioids*, FIN.TIMES (Sept. 9, 2018), https://www.ft.com/content/8e64ec9c-b133-11e8-8d14- 6f049d06439c.

[26] *Id.*

Turbocharge," and urged the Sackler family and the board of directors to adopt it. Specifically, McKinsey urged the board of directors to "make a clear go-no go to 'Turbocharge the Sales Engine.'"

115.   McKinsey's "Project Turbocharge" recommendations included revising the existing process for targeting high-prescribing physicians, with a shift from targeting solely on the basis of prescription deciles to considering additional factors. Based on its analysis, McKinsey told Purdue that "[t]here is significant opportunity to slow the decline of OxyContin by calling on more high-value physicians" and that "[t]he revenue upside from sales re-targeting and adherence could be up to $250 million."

116.   The Sacklers were impressed with McKinsey's work. On August 15, 2013, Richard Sackler emailed Mortimer D.A. Sackler, "the discoveries of McKinsey are astonishing."

117.   Eight days later, on August 23, 2013, McKinsey partners met with the Sackler family – not the Purdue board of directors – in order to pitch Project Turbocharge. Dr. Arnab Ghatak, one of the McKinsey partners leading the Purdue account, recounted the meeting to fellow partner Elling in an email exchange: "[T]he room was filled only with family, including the elder statesman Dr. Raymond [Sackler] . . . We went through exhibit by exhibit for about 2 hrs . . . They were extremely supportive of the findings and our recommendations . . . and wanted to strongly endorse getting going on our recommendations."

118.   Elling, a co-leader of McKinsey's Purdue account, remarked in the same email correspondence that McKinsey's "findings were crystal clear to" the Sacklers, and that the Sacklers "gave a ringing endorsement of 'moving forward fast.'"

119.   As a result of the Sackler family endorsement of McKinsey's proposals, the following   month   Purdue   implemented   Project   Turbocharge   based   on   McKinsey's

recommendations. In adopting "Project Turbocharge," Purdue acknowledged the improper connotations of the name, and re-christened the initiative the more anodyne "E2E: Evolve to Excellence."[27]

120.     Evolve to Excellence ("E2E") was the theme of Purdue's 2014 National Sales Meeting.

121.     Purdue CEO Stewart also told sales staff that board member Paolo Costa was a "champion for our moving forward with a comprehensive 'turbocharge' process," referring to McKinsey's plan.

122.     After Purdue adopted McKinsey's recommendations, McKinsey continued to work with Purdue sales and marketing staff reporting to Gasdia during Purdue's implementation of McKinsey's recommendations.

123.     In fact, the entire E2E initiative was overseen by McKinsey and some Purdue executives, who together comprised the E2E Executive Oversight Team and Project Management Office.

124.     At the same time, the Sacklers were kept informed of the implementation of McKinsey's OxyContin strategy. According to a September 13, 2013 board agenda, the board of directors discussed with the Sacklers the ongoing implementation of McKinsey's sales tactics.

125.     McKinsey's Project Turbocharge, now re-named Evolve to Excellence, called for a *doubling* of Purdue's sales budget. Under McKinsey's prior tutelage, Purdue's promotional spending had already skyrocketed. McKinsey's influence on Purdue's operations after the 2007 guilty plea is stark:

---

[27] Regarding the name change, CEO Stewart wrote to McKinsey partners Rosiello and Ghatak on August 15, 2013: "Paolo Costa was especially engaged in the discussion and he (among others) will be a champion for our moving forward with a comprehensive 'turbocharge' process – though we do need to find a better and more permanently appropriate name."



126.    At the time of McKinsey's first known work for Purdue, Purdue spent approximately $5 million per quarter on sales and marketing. By the time McKinsey's Project Turbocharge had been implemented, total quarterly sales and marketing spending at Purdue exceeded $45 million per quarter, an increase of *800%*.

127.    Project Turbocharge continued despite the arrival of a new CEO at Purdue. On January 17, 2014, new CEO Mark Timney received reports from McKinsey emphasizing that, in order to increase profits, Purdue must again increase the number of sales visits to "high-value" prescribers, i.e., those that prescribe the most OxyContin.[28]

128.    McKinsey also urged, consistent with their granular approach, that sales

---

[28] In fact, recent deposition testimony suggests McKinsey may have even been responsible for the fact that Timney was given the CEO job at Purdue in the first place. On October 30, 2020, Timney provided the following testimony:

Q: Are you familiar with McKinsey & Company?

A: I decline to answer on the ground that I may not be compelled to be a witness against self in any proceeding.

representatives devote two-thirds of their time to selling OxyContin and one-third of their time selling Butrans, another Purdue product. Previously, the split had been fifty-fifty.

129.    Purdue implemented McKinsey's prescribed course of action.

**F.      McKinsey's Efforts Triple OxyContin Sales**

130.    Purdue got what it wanted out of McKinsey and McKinsey got what it wanted out of Purdue. Between the years of 2008 through 2016, Purdue distributed in excess of $4 billion to the Sackler family, with $877 million distributed in 2010 alone. McKinsey was paid handsomely for its work.

131.    These distributions would not have been possible without the McKinsey's work dramatically increasing OxyContin sales.

132.    The Sacklers were aware of the value McKinsey provided: on December 2, 2013, CEO Stewart informed Kathe Sackler and Vice President of Sales and Marketing Gasdia Project Turbocharge "was already increasing prescriptions and revenue." Crucially, these results were already being realized before the strategy was fully deployed as the theme of the 2014 National Sales Meeting.

133.    McKinsey's contributions to Purdue's growth after 2007 are astonishing. OxyContin sales should have naturally declined: the Department of Justice identified OxyContin sales that were illegitimate because of Purdue's conduct, and the Inspector General of HHS entered into a Corporate Integrity Agreement whereby Purdue was monitored to assure that those sales did not continue. And yet, in 2007 – the year of Purdue's guilty plea – net sales of OxyContin totaled approximately $1 billion.[29]

134.    The guilty plea "did little to stem Purdue's blistering growth rate." In fact, by

---

[29] *See* David Crow, How Purdue's 'one-two' punch fueled the market for opioids, FIN. TIMES (Sept. 9, 2018), https://www.ft.com/content/8e64ec9c-b133-11e8-8d14-6f049d06439c.

2010, after McKinsey was advising Purdue on how to maximize sales, OxyContin sales exceeded

$3 billion: a *tripling* of revenue from OxyContin sales.[30]

135.    Under McKinsey's guidance, OxyContin sales would reach their all-time peak in

2013, the year McKinsey proposed, and Purdue adopted, Project Turbocharge.[31] That OxyContin

sales peaked in 2013 is especially notable, given that *overall* opioid prescriptions had *already*

*peaked* three years earlier, in 2010.[32] McKinsey's efforts added a final boost to OxyContin sales

before the eventual unraveling, and Purdue's decision, in the end, to cease marketing the drug.

136.    By 2018, with OxyContin sales in their inexorable decline, Purdue announced that

it would cease sending sales representatives to healthcare providers to promote OxyContin. The

ranks of sales representatives were cut back to 200 people – the approximate size of Purdue's

sales staff prior to the initial launch of OxyContin.

137.    In 2014, according to Purdue, there were 5.4 million OxyContin prescriptions

written, 80% for twelve-hour dosing. Of those prescriptions, more than half were for doses

greater than 60 milligrams per day.

**G.      McKinsey Developed and Helped Implement a Plan to Increase OxyContin
Prescriptions Despite Knowing about the Corporate Integrity Agreement and the Dangers
of Opioids.**

138.    McKinsey has long maintained a Pharmaceuticals and Medical Products ("PMP")

industry practice group dedicated to working with pharmaceutical companies. In 2003, when

McKinsey's relationship with Purdue began, the PMP group was led by Michael Pearson

---

[30] *Id.*

[31] Phil McCausland & Tracy Connor, OxyContin maker Purdue to stop promoting opioids in light of epidemic, NBC NEWS (Feb. 10, 2018), https://www.nbcnews.com/storyline/americas- heroin-epidemic/oxycontin-maker-purdue-stop-promoting-opioids-light-epidemic-n846726.

[32] Gery P. Guy Jr, et al., Vital Signs: Changes in Opioid Prescribing Patterns in the United States, 2006-2015,       MORB.MORTALWKLY.REP.       (July       7,       2017), https://www.cdc.gov/mmwr/volumes/66/wr/mm6626a4.htm.

("Pearson"). Pearson worked for McKinsey for 23 years and was a member of the firm's shareholder council (McKinsey's equivalent of a board of directors) in addition to leading PMP before departing McKinsey in 2008 to helm Valeant Pharmaceuticals.[33] (While helmed by Pearson, Valeant later faced public outrage and legal scrutiny for imposing enormous price increases on old drugs.)

139.    Pearson stated: "At McKinsey pharmaceuticals was one of our biggest industry groups."[34] Pearson was "not the quintessential suave and intellectual McKinsey partner. He was loud and profane and was seen, in the words of one former colleague, as 'sharp-edged and sharp elbowed.'"[35]

140.    Under his leadership, McKinsey's knowledge and expertise in the pharmaceutical industry was significant. By 2009, McKinsey described its capabilities: "We have an unparalleled depth of both functional and industry expertise as well as breadth of geographical reach. Our scale, scope, and knowledge allow us to address problems that no one else can. At heart, we are a network of people who are passionate about taking on immense challenges that matter to leading organizations, and often, to the world."

141.    In 2012, while advising Purdue, McKinsey described its health care capabilities thusly: "Indeed, there is a doctor in the house. We have more than 1,700 consultants with significant healthcare experience, including more than 150 physicians and 250 consultants with

---

[33] John Gapper, McKinsey's fingerprints are all over Valeant, FIN. TIMES (Mar. 23, 2016), https://www.ft.com/content/0bb37fd2-ef63-11e5-aff5-19b4e253664a. Notably, Rosiello, a McKinsey partner who was a co-lead of the Purdue account, went to join Pearson at Valeant Pharmaceuticals in 2015 as Chief Financial Officer.

[34] Michael Peltz, Mike Pearson's New Prescription for the Pharmaceuticals Industry, INSTITUTIONAL INV. (Sept. 3, 2014), https://www.institutionalinvestor.com/article/b14zbjfm8nf1c4/mike-pearsons-new-prescription- for-the-pharmaceuticals-industry.

[35] John Gapper, McKinsey's fingerprints are all over Valeant, FIN. TIMES (Mar. 23, 2016), https://www.ft.com/content/0bb37fd2-ef63-11e5-aff5-19b4e253664a.

advanced degrees in genetics, immunology, biochemical engineering, neurobiology, and other life sciences. We also have 75 consultants with advanced degrees in public health, healthcare management, and related fields."

142.    By the time McKinsey was working with Purdue on sales and marketing in 2009, it already had extensive experience with opioids. As early as 2002, McKinsey was advising other opioid manufacturers regarding methods to boost sales of their drugs. For example, on March 14, 2002, McKinsey prepared a confidential report for Johnson & Johnson regarding how to market their opioid Duragesic. Incredibly, one of the recommendations McKinsey provided to Johnson & Johnson was that they concentrate their sales and marketing efforts on doctors that were already prescribing large amounts of Purdue's OxyContin.[36]

143.    As early as 2002 McKinsey had such intricate knowledge of the sales and marketing practices of opioid manufacturers, generally, and Purdue's efforts with OxyContin, specifically, that it was able to recommend to a *competitor of Purdue* that it boost its own opioid sales by *following in the footsteps of Purdue*.

144.    Purdue's 2007 guilty plea put McKinsey on notice of Purdue's misconduct. By that time, although the full scale of the opioid epidemic was not yet clear, McKinsey had access to public information indicating that OxyContin and other opioids pose significant risk of addiction and misuse.

145.    In February 2009, Dr. Art Van Zee, in his peer-reviewed article in the American Journal of Public Health entitled "*The Promotion and Marketing of OxyContin: Commercial Triumph, Public Health Tragedy*," stated the matter plainly: "Compared with non-controlled

---

[36] Chris McGreal, Johnson & Johnson faces multibillion opioids lawsuit that could upend big pharma, THE GUARDIAN (June 23, 2019), https://www.theguardian.com/us-news/2019/jun/ 22/johnson-and-johnson-opioids-crisis-lawsuit-latest-trial.

drugs, controlled drugs, with their potential for abuse and diversion, pose different public health risks when they are over-promoted and highly prescribed." "By 2004, OxyContin had become the most prevalent prescription opioid abused in the United States."

146. Further, Dr. Van Zee identified the *precise tactics* that McKinsey deployed for Purdue as a source of OxyContin misuse and abuse, and suggested that regulation may be appropriate to curtail its use: "The use of prescriber profiling data to target high-opioid prescribers—coupled with very lucrative incentives for sales representatives—would seem to fuel increased prescribing by some physicians—perhaps the most liberal prescribers of opioids and, in some cases, the least discriminate."

147. Indeed, one reason that *Purdue* had knowledge that their own products were addictive and dangerous is because McKinsey told them. On September 13, 2013 McKinsey briefed Purdue on the ongoing concerns regarding OxyContin addiction and diversion among prescribers:



**Findings on messaging and positioning**   |PRELIMINARY

- Opioids overall are still viewed as effective and necessary class of painkillers, though side effects and addiction are concerns
- Key themes from prescriber interviews on abuse deterrents include:
  - Prescriber awareness of abuse deterrence and label change is mixed
  - Opinions on impact/efficacy of abuse deterrence vary
  - Most prescribers are concerned about abuse, but attempt to establish measures to protect themselves
  - Concerns remain that technology does not address oral abuse
  - Less informed prescribers ask for additional information and education around abuse deterrent formulations
- Existing market research suggests that most physicians do not feel that reformulation positively impacts their prescribing behavior, and that diversion, abuse and regulatory concerns continue to weigh on prescribers

McKinsey & Company | 27

148.    In a PowerPoint slide entitled "Findings on messaging and positioning," part of a presentation to Purdue entitled "OxyContin growth opportunities: Phase 1 Final Report: Diagnostic," McKinsey noted that "most prescribers are concerned about abuse," and that "most physicians do not feel that [OxyContin] reformulation positively impacts their prescribing behavior, and that diversion, abuse and regulatory concerns continue to weigh on prescribers."

149.    Of course, to argue that McKinsey had contemporaneous knowledge of the fact that increasing OxyContin sales create ever more addiction and misuse in some ways misses the point. It disregards the context in which McKinsey was operating after 2009: advising a monoline manufacturer of opioids about sales and marketing practices for its addictive products while that manufacturer is bound by a five-year Corporate Integrity Agreement covering the very same opioid sales and marketing practices. In 2012, OxyContin accounted for 94% of Purdue's revenue.[37] As late as 2018, it remained 84% of Purdue's revenue.[38]

150.    Rather than working to limit these disastrous effects, McKinsey treated doctors' misgivings as obstacles to confront with new messaging.

151.    McKinsey's mandate was to increase Purdue's opioid sales during a time when Purdue was obligated to restrict its previous marketing strategies because those strategies had caused the ***overprescribing*** of opioids and the inevitable consequences thereof. McKinsey's job was to counter the intended results of the Corporate Integrity Agreement; to devise strategies to sell as many pills as conceivably possible. Under McKinsey's tutelage, Purdue's growth continued its upward trajectory unabated, the Corporate Integrity Agreement notwithstanding.

152.    If McKinsey was not aware of the adverse consequences of OxyContin, the drug it was paid to sell, such ignorance could not survive the granular reality of its relationship with

---

[37] Gerald Posner, *Pharma* 524 (2020)

Purdue. In June 2009, the earliest known work McKinsey performed for Purdue[39] consisted of "countering the emotional messages from mothers with teenagers that overdosed on OxyContin."

153.    Another indication that OxyContin sales should not be turbocharged: during McKinsey's work for Purdue, Purdue was unable to purchase product liability insurance to cover its practice of selling OxyContin.

154.    McKinsey's method of aggressive marketing of opioids to prescribers has demonstrably exacerbated the opioid crisis. A recent Journal of American Medical Association study analyzed the Centers for Medicare and Medicaid Services' Open Payments database regarding pharmaceutical company marketing efforts towards doctors, as well as CDC data on prescription opioid overdose deaths and prescribing rates, in order to assess whether pharmaceutical marketing of opioids to physicians affected the rate of prescription opioid overdose deaths. Notably, the study analyzed these marketing practices beginning August 1, 2013 and ending December 31, 2015.[40]

155.    These dates are significant, as the study captures the same timeframe that McKinsey's Project Turbocharge was implemented at Purdue.

156.    The study noted "physician prescribers are the most frequent source of prescription opioids for individuals who use opioids nonmedically."

157.    The study found that "increased county-level opioid marketing was associated

---

[38] *Id.*

[39] In a 2013 presentation to Purdue's CEO and Vice President of Sales and Marketing, McKinsey referenced McKinsey's "prior experiences serving Purdue that go back 10 years." Presentation by McKinsey to John Stewart and Russell Gasdia entitled Identifying granular growth opportunities for OxyContin: First Board Update, at 2 (July 18, 2013). While McKinsey's relationship with Purdue dates back to approximately 2003, the earliest known details of its work for Purdue date to June 2009. What McKinsey did for Purdue before 2009 is not presently known.

[40] Scott E. Hadland et al., Association of Pharmaceutical Industry Marketing of Opioid Products with Mortality from Opioid-Related Overdoses, 2 JAMA NETWORK 1 (Jan. 18, 2019), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2720914.

with elevated overdose mortality 1 year later, an association mediated by opioid prescribing rates; per capita, *the number of marketing interactions with physicians demonstrated a stronger association with mortality than the dollar value of marketing*." (emphasis added).

158.    Marvin Bower, a founding father of McKinsey and managing director of the firm from 1950 to 1967, instilled an ethos at McKinsey that has been reinforced throughout the decades as a core value of the firm: "Deliver bad news if you must, but deliver it properly."[41]

159.    McKinsey's work with Purdue, which began just after his death in 2003, would have been unrecognizable to Bower, one of the founders of modern management consulting. Instead of acknowledging the elephant in the room – that Purdue's business was knowingly maximizing the amount of addictive and deadly opioids sold in the United States – and delivering that bad news properly to the client, McKinsey instead committed to partner with Purdue to maximize opioid sales, the torpedoes be damned.

160.    On October 23, 2017, the President of the United States declared the ongoing nationwide opioid epidemic a "public health emergency." Even at this late hour in the crisis, McKinsey continued to propose solutions to the Sacklers and Purdue to further boost opioid sales. These solutions were fashioned, in perfect McKinsey parlance, as "high impact interventions to rapidly address market access challenges."

161.    Less than two months after the public health emergency declaration, McKinsey proposed these high impact interventions to Purdue and its board of directors. Among them was perhaps McKinsey's most audacious gambit of the entire Purdue relationship: paying money – "rebates" – to health insurers whenever someone overdosed on Purdue's drug.

---

[41] McDonald, *The Firm,* at 35.

162.    Once again, in perfect McKinsey parlance,[42] these payments for future OxyContin overdoses were christened "Event-Based contracts." To wit:



163.    Helpfully, McKinsey provided estimates for the future costs of these "events." McKinsey noted that, if Purdue were to start making overdose payments, it would "need to determine which payment amount is optimal."

164.    A "meaningful" amount, according to McKinsey, would be somewhere between six and fifteen thousand dollars for each person who overdoses or develops opioid-use disorder as a result of Purdue's drugs:

---

[42] "Consultant-ese," when applied to work as grim as maximizing opioid sales in the face of a national disaster, led one former McKinsey consultant to state: "This is the banality of evil, M.B.A. edition." Walt Bogdanich & Michael Forsythe, McKinsey Proposed Paying Pharmacy Companies Rebates for OxyContin Overdoses, N.Y. TIMES (Nov. 27, 2020), https://www.nytimes.com/2020/11/27/business/mckinsey-purdue-oxycontin-opioids.html.



165.    The money would be paid to health insurers for the increased costs of additional medical services that resulted from the fact that Purdue's medications caused opioid-use disorder and overdoses in people whose health care costs were the payors' obligation. The money McKinsey proposed Purdue pay out in these circumstances would not go to the individuals afflicted, nor the estates of the dead.

166.    It is little surprise, then, that McKinsey was concerned with its legal liability for this work. Within months of recommending "event-based contracts" to Purdue, Elling raised this concern with Ghatak and suggested corrective action: destroying evidence. On July 4, 2018, Elling wrote: "It probably makes sense to have a quick conversation with the risk committee to see if we should be doing anything other than eliminating all our documents and emails." Ghatak responded, "Thanks for the heads up. Will do."

Message
_____

From:       Martin Elling [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP
            (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=6B33C3264F744B04AF05FA59341271BE-MARTIN ELLI]
Sent:       7/4/2018 12:10:13 PM
To:         A G [drarnabghatak@gmail.com]
Subject:    Re: [EXT]Re: Howdy


Have a great fourth.  M

> On Jul 4, 2018, at 2:01 PM, A G <drarnabghatak@gmail.com> wrote:
>
> Thanks for the heads up.  Will do.
>
>> On Jul 4, 2018, at 7:57 AM, Martin Elling <martin_elling@mckinsey.com> wrote:
>>
>> Just saw in the FT that Judy Lewent is being sued by states attorneys general for her role on the
Purdue Board.  It probably makes sense to have a quick conversation with the risk committee to see if we
should be doing anything other that eliminating all our documents and emails.  Suspect not but as things
get tougher there someone might turn to us.  M
>>
>> +=========================================================+
>> This email is confidential and may be privileged. If you have received it
>> in error, please notify us immediately and then delete it.  Please do not
>> copy it, disclose its contents or use it for any purpose.
>> +=========================================================+

167.    Elling's prediction that things would "get tougher" for Purdue would prove
prescient.

168.    A former McKinsey consultant described McKinsey's work with Purdue as "the
banality of evil, M.B.A. edition … They knew what was going on. And they found a way to
look past it, through it, around it, so as to answer the only questions they cared about: how
to make the client money, and when the walls closed in, how to protect themselves."[43]

## H.    Guilty Again: Purdue's 2020 Guilty Plea and McKinsey's Statement.

169.    On October 20, 2020, Purdue – McKinsey's co-conspirator – once again agreed
with the United States Department of Justice to plead guilty to improper marketing of OxyContin
and other opioids. This time the plea agreement concerned conduct from 2010 to 2018, the period
during which McKinsey designed and helped implement an opioid marketing strategy for

_____

[43] Walt Bogdanich & Michael Forsythe, *McKinsey Proposed Paying Pharmacy Companies Rebates for
OxyContin Overdoses*, N.Y. Times (updated Dec. 17, 2020), https://www.
nytimes.com/2020/11/27/business/mckinsey-purdue-oxycontin-opioids.html?name=styln-
opioid&region=TOP_BANNER&block=storyline_menu_recirc&action=click&pgtype=Article&
impression_id=b 745da80-69ce-11eb-ba7f-1321124f4232&variant=1_Show.

Purdue.

170.    Purdue agreed to plead guilty to a dual-object conspiracy to defraud the United States and to violate the Food, Drug, and Cosmetic Act, 21 U.S.C. §§331, 353, among other charges, relating to its opioid sales and marketing practices after the 2007 guilty plea. Purdue agreed to plead guilty to violating anti-kickback laws, paying illegal kickbacks to doctors, and "using aggressive marketing tactics to convince doctors to unnecessarily prescribe opioids – frivolous prescriptions that experts say helped fuel a drug addiction crisis that has ravaged America for decades."[44]

171.    The new plea agreement does not identify Purdue's co-conspirators, and McKinsey is not identified by name in the agreement. Instead, McKinsey is referred to as the "consulting company."

172.    Purdue's new guilty plea concerns Covered Conduct (as defined in the plea agreement) that directly implicates McKinsey in the conspiracy. It is the same conduct described in this Complaint.

173.    Indeed, the plea agreement signed by McKinsey's co-conspirator states bluntly: "Purdue, *in collaboration with [McKinsey],* implemented many of [McKinsey's] recommendations." (emphasis added).

174.    Further, Purdue admitted that E2E "*was overseen by [McKinsey]* and some of Purdue's top executives through the creation of the E2E Executive Oversight Team ("EOT") and Project Management Office ("PMO")." (emphasis added).

175.    On December 5, 2020, McKinsey issued a rare public statement regarding its

---

[44] Jan Hoffman & Katie Benner, *Purdue Pharma Pleads Guilty to Criminal Charges for Opioid Sales*, N.Y. Times (updated Dec. 17, 2020), https://www.nytimes.com/2020/10/21/health/purdue-opioids-criminal-charges.html.

work with a specific client on its website. The client was Purdue, and the statement was issued in response to Purdue's second guilty plea and recent media reports regarding McKinsey's work selling OxyContin after 2007:[45]

## McKinsey statement on its past work with Purdue Pharma

*December 5, 2020*—As we look back at our client service during the opioid crisis, we recognize that we did not adequately acknowledge the epidemic unfolding in our communities or the terrible impact of opioid misuse and addiction on millions of families across the country. That is why last year we stopped doing any work on opioid-specific business, anywhere in the world.

Our work with Purdue was designed to support the legal prescription and use of opioids for patients with legitimate medical needs, and any suggestion that our work sought to increase overdoses or misuse and worsen a public health crisis is wrong. That said, we recognize that we have a responsibility to take into account the broader context and implications of the work that we do. Our work for Purdue fell short of that standard.

We have been undertaking a full review of the work in question, including into the 2018 email exchange which referenced potential deletion of documents. We continue to cooperate fully with the authorities investigating these matters.

176.    As the statement indicates, McKinsey stopped doing work "anywhere in the world." Given that Purdue's operations addressed only the United States, the global reach of McKinsey's regret is noteworthy.

177.    In August of 2013, when the Sacklers adopted McKinsey's "Project Turbocharge" for Purdue, Tim Reiner ("Reiner"), a long-time McKinsey consultant, joined Mundipharma. Mundipharma is a separate company – also owned by the Sacklers – that sells opioids internationally.

178.    Reiner is currently the Sacklers' "Chief Business Officer" at Mundipharma. As

---

[45] *McKinsey statement on its past work with Purdue Pharma*, McKinsey & Co. (Dec. 5, 2020), https://www.mckinsey.com/about-us/media/mckinsey-statement-on-its-past-work-with-purdue-pharma#.

late as 2019, Mundipharma has been asserting many of the same misleading claims about opioids that previously led to criminal liability in the United States.[46]

179.    "It's right out of the playbook of Big Tobacco. As the United States takes steps to limit sales here, the company goes abroad," stated former commissioner of the U.S. Food and Drug Administration, David Kessler.[47]

180.    Recently, McKinsey has settled opioid-related claims with 49 states, the District of Columbia, and five U.S. territories.

## I.    Impact of McKinsey and Purdue's Conduct:

181.    McKinsey's method of aggressive marketing of opioids to prescribers has demonstrably exacerbated the opioid crisis. A recent Journal of American Medical Association study analyzed the Centers for Medicare and Medicaid Services' Open Payments database regarding pharmaceutical company marketing efforts towards doctors, as well as CDC data on prescription opioid overdose deaths and prescribing rates, in order to assess whether pharmaceutical marketing of opioids to physicians affected the rate of prescription opioid overdose deaths. Notably, the study analyzed these marketing practices beginning August 1, 2013 and ending December 31, 2015.[48]

182.    These dates are significant, as the study captures the same timeframe that McKinsey's Project Turbocharge was implemented at Purdue.

183.    The study noted "[p]hysician prescribers are the most frequent source of prescription opioids for individuals who use opioids nonmedically."

---

[46] *See* Erika Kinetz, *Fake doctors, pilfered medical records drive OxyChina sales*, ASSOC.PRESS (Nov. 19, 2019), https://apnews.com/article/4122af46fdba42119ae3db30aa13537c.

[47] Harriet Ryan, Lisa Girion, & Scott Glover, *OxyContin goes global – "We're only just getting started,"* L.A. TIMES (Dec. 18, 2016), https://www.latimes.com/projects/la-me- oxycontin-part3/.

[48] Scott E. Hadland et al., *Association of Pharmaceutical Industry Marketing of Opioid Products with*

184.    The study found that "increased county-level opioid marketing was associated with elevated overdose mortality 1 year later, an association mediated by opioid prescribing rates; per capita, the number of marketing interactions with physicians demonstrated a stronger association with mortality than the dollar value of marketing."

185.    As a result of McKinsey's development and execution of various marketing plans, Plaintiff and the Class paid or incurred costs for prescription opioid drugs manufactured, marketed, sold, or distributed by Purdue and other Opioid Marketing Enterprise Defendants, for purposes other than resale, and incurred costs for treatment related to the misuse, addiction and/or overdose of opioid drugs during the class period.

## J.    The Opioid Marketing Enterprise

## 1.    The Common Purpose and Scheme of the Opioid Marketing Enterprise

186.    Opioid manufacturers, including Purdue, Johnson & Johnson, Cephalon, Janssen, Endo, and Mallinckrodt, together with consulting firm McKinsey (collectively, the "RICO Marketing Enterprise Members"), engaged in a scheme to unlawfully increase sales of opioids through repeated and systematic misrepresentations about the safety and efficacy of opioids for treating long-term chronic pain.

187.    Knowing that opioids were highly addictive, ineffective and unsafe for the treatment of long-term chronic pain, non-acute and non-cancer pain, the RICO Marketing Enterprise Members (including Defendant McKinsey) formed an association-in-fact enterprise and engaged in a scheme to unlawfully increase their profits and sales, and grow their share of the prescription painkiller market, through repeated and systematic misrepresentations about the safety and efficacy of opioids for treating long-term chronic pain.

---

*Mortality from Opioid-Related Overdoses*, 2 JAMA Network 1 (Jan. 18, 2019)

188.    In order to unlawfully increase the demand for opioids, the RICO Marketing Defendants formed an association-in-fact enterprise (the "Opioid Marketing Enterprise"). Through their personal relationships, the members of the Opioid Marketing Enterprise had the opportunity to form and take actions in furtherance of the Opioid Marketing Enterprise's common purpose. The RICO Marketing Enterprise Member's substantial financial contribution to the Opioid Marketing Enterprise, and the advancement of opioids-friendly marketing/messaging, fueled the U.S. opioids epidemic.

189.    The RICO Marketing Enterprise Members, through the Opioid Marketing Enterprise, concealed the true risks and dangers of opioids from the medical community and the public, including Plaintiff and the class, and made misleading statements and misrepresentations about opioids that downplayed the risk of addiction and exaggerated the benefits of opioid use. The misleading statements included: (1) that addiction is rare among patients taking opioids for pain; (2) that addiction risk can be effectively managed; (3) that symptoms of addiction exhibited by opioid patients are actually symptoms of an invented condition the RICO Marketing Defendants named "pseudoaddiction"; (4) that withdrawal is easily managed; (5) that increased dosing present no significant risks; (6) that long-term use of opioids improves function; (7) that the risks of alternative forms of pain treatment are greater than the adverse effects of opioids; (8) that use of time-released dosing prevents addiction; and (9) that abuse-deterrent formulas provide a solution to opioid abuse.

190.    The scheme devised, implemented and conducted by the RICO Marketing Enterprise Members was a common course of conduct designed to ensure that the RICO Marketing Enterprise Members unlawfully increased their sales and profits through concealment and misrepresentations about the addictive nature and effective use of the RICO Marketing

Enterprise Members' drugs. The RICO Marketing Enterprise Members acted together for a common purpose and perpetuated the Opioid Marketing Enterprise's scheme.

191.    There was regular communication among the RICO Marketing Enterprise Members, including between McKinsey and its opioid manufacturer clients (including Purdue), in which information was shared, misrepresentations were coordinated, and payments were exchanged. The RICO Marketing Enterprise Members functioned as a continuing unit for the purpose of implementing the Opioid Marketing Enterprise's scheme and common purpose, and each agreed and took actions to hide the scheme and continue its existence.

192.    As public scrutiny and media coverage focused on how opioids ravaged communities in throughout the United States, McKinsey did not challenge Purdue or other manufacturers' misrepresentations, seek to correct their previous misrepresentations, terminate their role in the Opioid Marketing Enterprise, nor disclose publicly that the risks of using opioids for chronic pain outweighed their benefits and were not supported by medically acceptable evidence. Instead, McKinsey continued to participate in the Opioid Marketing Enterprise for financial gain.

**2.         The Conduct of the Opioid Marketing Enterprise Violated Civil RICO**

193.    From at least 2004 through the present, each of the RICO Marketing Enterprise Members (including McKinsey) exerted control over the Opioid Marketing Enterprise and participated in the operation or management of the affairs of the Opioid Marketing Enterprise, directly or indirectly, in the following ways:

a) Creating and providing a body of deceptive, misleading and unsupported medical and popular literature about opioids that (i) understated the risks and overstated the benefits of long-term use; (ii) appeared to be the result of independent, objective research; and (iii) was thus more likely to be relied upon by physicians, patients, and payors;

b)  Creating and providing a body of deceptive, misleading and unsupported electronic and print advertisements about opioids that (i) understated the risks and overstated the benefits of long-term use; (ii) appeared to be the result of independent, objective research; and (iii) was thus more likely to be relied upon by physicians, patients, and payors;

c)  Creating and providing a body of deceptive, misleading and unsupported sales and promotional training materials about opioids that (i) understated the risks and overstated the benefits of long-term use; (ii) appeared to be the result of independent,objective research; and (iii) was thus more likely to be relied upon by physicians, patients, and payors;

d)  Devising and implementing marketing schemes that included targeting and misleading physicians, unlawfully incentivizing sales representatives to maximizeprescriptions and dosages, and evading regulatory constraints;

e)  Disseminating many of their false, misleading, imbalanced, and unsupported statements through unbranded materials that appeared to be independent publications; and

f)  Using front groups and key opinion leaders ("KOLs") to mislead the public aboutopioids.

194.   The scheme devised and implemented by the RICO Marketing Enterprise Members amounted to a common course of conduct intended to increase the RICO Marketing Enterprise Members' sales from prescription opioids by encouraging the prescribing and use of opioids for long-term chronic pain. The scheme was a continuing course of conduct, and many aspects of it continue through to the present.

**3.        Pattern of Racketeering Activity**

195.   The RICO Marketing Enterprise Members' scheme was perpetrated, in part, through multiple acts of mail fraud and wire fraud, constituting a pattern of racketeering activity as described herein.

196.   The pattern of racketeering activity used by the RICO Marketing Enterprise Members and the Opioid Marketing Enterprise likely involved thousands of separate instances of the use of the U.S. mail or interstate wire facilities in furtherance of the unlawful Opioid

Marketing Enterprise, including essentially uniform misrepresentations, concealments, and material omissions regarding the beneficial uses and non-addictive qualities for the long-term treatment of chronic, non-acute, and non-cancer pain, with the goal of profiting from the increased sales of opioids that occurred because consumers, prescribers, regulators, Plaintiff, and the Class accepted and/or relied on the RICO Marketing Enterprise Members' misrepresentations.

197.    Each of these fraudulent mailings and interstate wire transmissions constitutes racketeering activity and, collectively, these violations constitute a pattern of racketeering activity, through which the RICO Marketing Enterprise Members defrauded and intended to defraud consumers, prescribers, regulators, payors, Plaintiff, the Class, and other intended victims.

198.    The RICO Marketing Enterprise Members devised and knowingly carried out an illegal scheme and artifice to defraud by means of materially false or fraudulent pretenses, representations, promises, or omissions of material facts regarding the safe, non-addictive and effective use of opioids for long-term chronic, non-acute and non-cancer pain. The RICO Marketing Enterprise Members and members of the Opioid Marketing Enterprise knew that these representations violated the FDA approved use these drugs, and were not supported by actual evidence. The RICO Marketing Enterprise Members, including McKinsey, intended that that their common purpose and scheme to defraud would, and did, use the U.S. mail and interstate wire facilities, intentionally and knowingly with the specific intent to advance, and for the purpose of executing, their illegal scheme.

199.    By intentionally concealing the material risks and affirmatively misrepresenting the benefits of using opioids for chronic pain, the RICO Marketing Enterprise Members,

including McKinsey, engaged in a fraudulent and unlawful course of conduct constituting a pattern of racketeering activity.

200.    The RICO Marketing Enterprise Members' use of the U.S. mail and interstate wire facilities to perpetrate the opioids marketing scheme involved thousands of communications, publications, representations, statements, electronic transmissions, payments, including, *inter alia:*

  a. Marketing materials about opioids, and their risks and benefits, which the RICO Marketing Enterprise Participants sent to health care providers, transmitted through the internet and television, published, and transmitted to front groups and KOLs located across the country;

  b. Written representations and telephone calls between and among the RICO Marketing Enterprise Members and Front Groups regarding the misrepresentations, marketing statements and claims about opioids, including the non-addictive, safe use of chronic long-term pain generally;

  c. Written representations and telephone calls between and among the RICO Marketing Enterprise Members and KOLs regarding the misrepresentations, marketing statements and claims about opioids, including the non-addictive, safe use of chronic long-term pain generally;

  d. E-mails, telephone and written communications between and among the RICO Marketing Enterprise Members and the front groups agreeing to or implementing the opioids marketing scheme;

  e. E-mails, telephone and written communications between and among the RICO Marketing Enterprise Members and the KOLs agreeing to or implementing the opioids marketing scheme;

  f. Communications between the RICO Marketing Enterprise Members, front groups and the media regarding publication, drafting of treatment guidelines, and the dissemination of the same as part of the Opioid Marketing Enterprise;

  g. Communications between the RICO Marketing Defendants, KOLs and the media regarding publication, drafting of treatment guidelines, and the dissemination of the same as part of the Opioid Marketing Enterprise;Written and oral communications directed to the public, governmental entities, and public and private payors that fraudulently misrepresented the risks and benefits of using opioids for chronic pain; and

  h. Receipts of increased profits sent through the U.S. mail and interstate wire facilities

– the wrongful proceeds of the scheme.

201.    In addition to the above-referenced predicate acts, it was intended by and foreseeable to the RICO Marketing Enterprise Members that the front groups and the KOLs would distribute publications through the U.S. Mail and by interstate wire facilities and, in those publications, claim that the benefits of using opioids for chronic pain outweighed the risks of doing so.

202.    To achieve the common goal and purpose of the Opioid Marketing Enterprise, the RICO Marketing Enterprise Members and members of the Opioid Marketing Enterprise hid from the consumers, prescribers, regulators and Plaintiff and the Class: (a) the fraudulent nature of the RICO Marketing Defendants' marketing scheme; (b) the fraudulent nature of statements made by the RICO Marketing Enterprise Members and by their KOLs, front groups and other non-parties regarding the safety and efficacy of prescription opioids; and (c) the true nature of the relationship betweenthe members of the Opioid Marketing Enterprise.

203.    The RICO Marketing Enterprise Members, and each member of the Opioid Marketing Enterprise agreed, with knowledge and intent, to the overall objective of the RICO Marketing Enterprise Members' fraudulent scheme and participated in the common course of conduct tocommit acts of fraud and indecency in marketing prescription opioids.

204.    Indeed, for the RICO Marketing Enterprise Members' fraudulent scheme to work, each of them had to agree to implement similar tactics regarding fraudulent marketing of prescription opioids. This conclusion is supported by the fact that the RICO Marketing Enterprise Members financed, supported, and worked through the same KOLs and front groups, and often collaborated on and mutually supported the same publications, CMEs, presentations, and prescription guidelines

205.    The RICO Marketing Enterprise Members' predicate acts all had the purpose of

creating the opioid epidemic that substantially injured Plaintiffs' business and property, while simultaneously generating billion-dollar revenue and profits for the RICO Marketing Enterprise (including significant revenue for Purdue and McKinsey). The predicate acts were committed or caused to be committed by the RICO Marketing Enterprise Members, including McKinsey, through their participation in the Opioid Marketing Enterprise and in furtherance of its fraudulent scheme.

## V.       TOLLING OF THE STATUTE OF LIMITATIONS

206.    At all times relevant to this Complaint, McKinsey and Purdue took active steps to conceal their unlawful activities, including through the conspiracy alleged herein. For example and without limitation, McKinsey, Purdue, and other Opioid Marketing Enterprise Members concealed their efforts to (i) circumvent the restrictions of the Corporate Integrity Agreement in order to increase the sale of opioids; and (ii) further boost the sale of opioids after the expiration of that Agreement, including through "Project Turbocharge" and "Evolve to Excellence." McKinsey, Purdue, and other Opioid Marketing Enterprise Members further undertook active efforts to deceive Plaintiff, the Class, and the general public, thus concealing their unlawful conduct, including by making unfair and/or deceptive representations about the use of opioids to treat chronic and non-cancer pain, creating and implementing a deceptive opioid marketing strategy, omitting or concealing material facts, and failing to correct prior misrepresentations and omissions about the purported benefits and risks of opioids.

207.    *Discovery Rule.* McKinsey's consulting services were given confidentially, and the content of those services was not public. Plaintiff did not have knowledge of the scope, magnitude, and unlawful nature of McKinsey's conduct until 2020, when documents produced in the Purdue bankruptcy proceeding revealed details regarding McKinsey's role in advising Purdue and working with Purdue to implement the unlawful conduct detailed in this

Complaint.[49] Information in the public domain was insufficient to place Plaintiff and the Class on inquiry notice of McKinsey's unlawful, unfair, and deceptive activities prior to 2020. For these reasons, any statutes of limitations applicable to the claims of Plaintiff and the Class did not begin to run and have been tolled until at least some point in 2020.

208.    *Fraudulent Concealment*. The statutes of limitation were further tolled by the doctrine of fraudulent concealment. McKinsey, Purdue, and other Opioid Marketing Enterprise Members actively concealed the existence of their unlawful scheme, including through false or misleading representations. Despite the requirements of the Corporate Integrity Agreement, which restrained Purdue from making any deceptive or misleading claims about OxyContin, McKinsey devised a strategy and worked with Purdue to implement the strategy to maximize the sale of opioids, including through deceptive and misleading claims regarding the risks, efficacy, and medical necessity of opioids, generally, and Purdue's opioids, specifically. McKinsey knew these representations were false, made recklessly without knowledge of the truth, and/or had no reasonable ground for believing such assertions, but devised and implemented a strategy to spread these deceptive and misleading claims to health care providers, consumers, Plaintiff, the Class, and the public in order to boost sales of opioids, including OxyContin, despite the public impression that Purdue had corrected its conduct as a result of the Agreement.

209.    McKinsey and Purdue were deliberate in taking steps to conceal their conspiratorial behavior and active role in the deceptive marketing and the oversupply of opioids through overprescribing and suspicious sales, all of which fueled the opioid epidemic.

210.    McKinsey's fraudulent concealment prevented Plaintiff and the Class from

---

[49] *See*, *e.g.*, Walt Bogdanich & Michael Forsythe, McKinsey Proposed Paying Pharmacy Companies Rebates for OxyContin Overdoses, N.Y. TIMES (Nov. 27, 2020), https://www. https://www.mckinsey.com/about-us/media/mckinsey-statement-on-its-past-work-with-purdue-   pharma#. nytimes.com/2020/11/27/business/mckinsey-purdue-oxycontin-opioids.html.

discovering the scope, magnitude, and unlawful nature of McKinsey's conduct until 2020, when documents produced in the Purdue bankruptcy proceeding revealed details regarding McKinsey's role in advising Purdue and working with Purdue to implement the unlawful conduct detailed in this Complaint.

211.    *Continuing Tort.* McKinsey is estopped from relying on any statute of limitations defense because its illegal, deceptive, and fraudulent practices as alleged herein, which were continuing in nature, have created continuing and repeated injuries to Plaintiff and the Class.

## VI.    CLASS ACTION ALLEGATIONS

212.    Plaintiff brings this suit as a class action pursuant to Rule 23(b)(3) and 23(c)(4) of the Federal Rules of Civil Procedure.

213.    The Class is defined as:

> All health insurance companies, third-party administrators, health maintenance organizations, self-funded health and welfare benefit plans, third-party payors and any other health benefit provider, in the United States of America and its territories, who have since June 1, 2009 (a) paid or incurred costs for prescription Opioid drugs manufactured, marketed, sold, or distributed by the RICO Marketing Enterprise Members, for purposes other than resale, and/or (b) paid or incurred costs for treatment related to the misuse, addiction, and/or overdose of opioid drugs.

214.    Excluded from the Class are (1) the RICO Marketing Enterprise Members and their subsidiaries, affiliates, and controlled persons; (2) current or former officers, directors, agents, servants, or employees of the RICO Marketing Enterprise Members, and the immediate family members of any such person; (3) all persons who make a timely election to be excluded from the proposed Class; (4) governmental entities; and (5) the Court to which this case is assigned and its staff.

215.    Plaintiff reserves the right to amend or modify the Class definition with greater

specificity or further division into subclasses or limitation to particular issues.

216.    The proposed Class is sufficiently numerous, as thousands of members of the Class were induced to pay for opioid drugs and treatment due to the misuse, addiction and/or overdose through the RICO Marketing Enterprise Members scheme. The Class members are so numerous and dispersed throughout the United States that joinder of all members is impracticable. The Class is composed of thousands of third-party payors, and the disposition of their claims in a Class action will benefit both the parties and the Court. It is estimated that in 2007, at least half a million individuals nationwide received prescriptions for opioid drugs. The RICO Marketing Enterprise Members sell millions of doses of opioid drugs in the United States every year, and thus the Class is sufficiently numerous to make joinder impracticable, if not outright impossible.

217.    Class members can be identified by, inter alia, records maintained by RICO Marketing Enterprise Members, class members, pharmacies, and PBMs.

218.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class members are:

a.    Whether McKinsey engaged in the conduct alleged herein;

b.    Whether McKinsey substantially caused or contributed to the opioid epidemic;

c.    Whether McKinsey's conduct in creating, proposing, and implementing sales and marketing strategies for opioids manufactured by Purdue before and after Purdue's first guilty plea in 2007 relating to misbranding of OxyContin contributed to the class's injuries;

d.    Whether McKinsey performed reasonable due diligence in ascertaining the risks associated with Defendant's strategies for "turbocharging" OxyContin sales at Purdue in 2013 and thereafter;

e.  Whether Defendant's implementation of its own sales and marketing strategies at its client, Purdue, caused or contributed to an increase in opioid addiction;

f.  Whether McKinsey engaged in a pattern of deceptive, fraudulent and/or improper activity;

g.  Whether McKinsey and the other RICO Marketing Enterprise Members formed the Opioid Marketing Enterprise for the purpose of effectuating their fraudulent schemes;

h.  Whether the Opioid Marketing Enterprise used the U.S. mails and interstate wire facilities to carry out its fraudulent scheme;

i.  Whether the Opioid Marketing Enterprise engaged in a pattern of racketeering;

j.  Whether McKinsey's conduct, in whole or in part, has substantially affected interstate and intrastate commerce;

k.  Whether McKinsey engaged in conduct that violated the federal racketeering laws as alleged herein;

l.  Whether Plaintiff and the other members of the Class were injured by McKinsey's conduct and, if so, the appropriate class-wide measure of damages; and

m.  Whether McKinsey was unjustly enriched.

219.  Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff and the Class sustained damages arising out of the RICO Marketing Enterprise Members' (including McKinsey's) wrongful conduct as detailed herein. Specifically, Plaintiff, having expended substantial sums for the purchase of opioid drugs and treatment for their abuse, asserts claims that are typical of the claims of the entire Class, and will fairly and adequately represent and protect the interest of the Class.

220.  Plaintiff has no interests antagonistic to or in conflict with those of the Class members and therefore should be adequate as a representative for the Class members. Plaintiff has retained counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiff and its counsel are committed to vigorously prosecuting this action on behalf of

the Class members and have the financial resources to do so. Neither Plaintiff nor its counsel has any interest adverse to those of other Class members.

221.    A Class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members of the Class is impracticable. Furthermore, because the damages suffered by individual members of the Class may in some instances be relatively small, the expense and burden of individual litigation make it impossible for such Class members individually to redress the wrongs done to them. Also, the adjudication of this controversy through a Class action will avoid the possibility of inconsistent and possibly conflicting adjudications of the claims asserted herein. There will be no difficulty in the management of this action as a Class action.

222.    Even if members of the Class could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

## VII.    CLAIMS FOR RELIEF

### A.    COUNT ONE: VIOLATION OF RICO, 18 U.S.C. § 1961, *et seq.*

223.    Plaintiffs repeat, re-allege, and incorporate by reference each and every allegation set forth above as if fully set forth herein.

224.    Plaintiff brings this Count on behalf of itself and the proposed Class.

225.    This claim is brought by Plaintiff and the Class against McKinsey for actual damages, treble damages, and attorneys' fees under 18 U.S.C. § 1964, for violations of 18 U.S.C. § 1961, *et seq*.

226.    At all relevant times, McKinsey is and has been a "person" under 18 U.S.C. §

1961(3) because it is capable of holding, and does hold, "a legal or beneficial interest in property."

227.    Plaintiff and the members of the Class are "persons," as that term is defined in 18 U.S.C. § 1961(3), and have standing to sue as they were and are injured in their business and/or property as a result of McKinsey's wrongful conduct described herein.

228.    The RICO Marketing Enterprise Members' conducted an association-in-fact enterprise and/or participated in the conduct of an enterprise through a pattern of illegal activities the predicate racketeering acts of mail and wire fraud) to carry-out the common purpose of the Opioid Marketing Enterprise, *i.e.*, to unlawfully increase profits and revenues from the continued prescription and use of opioids for long-term, chronic pain. Through the racketeering activities of the Opioid Marketing Enterprise, the RICO Marketing Enterprise Members sought to further the common purpose of the enterprise through a fraudulent scheme to change prescriber habits and public perception about the safety and efficacy of opioid use. In so doing, each of the RICO Marketing Enterprise Members knowingly conducted and participated in the conduct of the Opioid Marketing Activities by engaging in mail and wire fraud, in violation of 18 U.S.C. §§ 1962(c) and (d).

229.    The Opioid Marketing Enterprise is an association-in-fact enterprise that consists of the RICO Marketing Enterprise Members.

230.    Each of the RICO Marketing Enterprise Members conducted and participated in the conduct of the Opioid Marketing Enterprise by playing a distinct role in furthering the enterprise's common purpose of increasing profits and sales through the knowing and intentional dissemination of false and misleading information about the safety and efficacy of long-term opioid use, and the risks and symptoms of addiction, in order to increase the market for

prescription opioids by changing prescriber habits and public perceptions.

231.    Specifically, the RICO Marketing Enterprise Members each worked together to coordinate the enterprise's goals and conceal their role, and the enterprise's existence, from the public by, among other things, (i) funding, editing, and distributing publications that supported and advanced their false messages; (ii) funding KOLs to further promote their false messages; and (iii) tasking their own employees to direct deceptive marketing materials and pitches directly at physicians.

232.    Further, each of the RICO Marketing Enterprise Members had systematic links to, and personal relationships with, each other through joint participation in lobbying groups, trade industry organizations, contractual relationships and continuing coordination of activities. The systematic links and personal relationships that were formed and developed allowed members of the Opioid Marketing Enterprise the opportunity to form the common purpose and agree to conduct and participate in the conduct of the Opioid Marketing Enterprise. Specifically, each of the RICO Marketing Enterprise Members coordinated their efforts through the same KOLs and front groups, based on their agreement and understanding that the front groups and KOLs were industry friendly and would work together with the RICO Marketing Enterprise Members to advance the common purpose of the Opioid Marketing Enterprise; and each of the individuals and entities who formed the Opioid Marketing Enterprise acted to enable the common purpose and fraudulent scheme of the Opioid Marketing Enterprise.

233.    At all relevant times, the Opioid Marketing Enterprise: (a) had an existence separate and distinct from each RICO Marketing Defendant and its members; (b) was separate and distinct from the pattern of racketeering in which the RICO Marketing Enterprise Members engaged; (c) was an ongoing and continuing organization consisting of individuals, persons, and

legal entities, including each of the RICO Marketing Enterprise Members; (d) was characterized by interpersonal relationships between and among each member of the Opioid Marketing Enterprise; and (e) had sufficient longevity for the enterprise to pursue its purpose and functioned as a continuing unit.

234.   The RICO Marketing Enterprise Members conducted and participated in the conduct of the Opioid Marketing Enterprise through a pattern of racketeering activity that employed the use of mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud), to increase profits and revenue by changing prescriber habits and public perceptions in order to increase the prescription and use of prescription opioids and expand the market for opioids.

235.   The RICO Marketing Enterprise Members each committed, conspired to commit, and/or aided and abetted in the commission of at least two predicate acts of racketeering activity (i.e., violations of 18 U.S.C. §§ 1341 and 1343) within the past ten years. The multiple acts of racketeering activity that the RICO Marketing Enterprise Members committed, or aided and abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity." The racketeering activity was made possible by the RICO Marketing Enterprise Members' regular use of the facilities, services, distribution channels, and employees of the Opioid Marketing Enterprise, the U.S. Mail, and interstate wire facilities. The RICO Marketing Enterprise Members participated in the scheme to defraud by using mail, telephones, and the Internet to transmit communications and payments in interstate or foreign commerce.

236.   The RICO Marketing Enterprise Members' predicate acts of racketeering (18 U.S.C. § 1961(1)) include, but are not limited to:

a.  Mail Fraud: The RICO Marketing Enterprise Members violated 18 U.S.C. § 1341 by sending or receiving, or by causing to be sent and/or received, materials via U.S. mail or commercial interstate carriers for the purpose of executing the unlawful scheme todesign, manufacture, market, and sell the prescription opioids by means of false pretenses, misrepresentations, promises, and omissions.

b.  Wire Fraud: The RICO Marketing Enterprise Members violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, materials by wire for the purpose of executing the unlawful scheme to design, manufacture, market, and sell the prescription opioids by means of false pretenses, misrepresentations, promises, and omissions.

237.    As summarized herein, the RICO Marketing Enterprise Members used the mail and wires to send or receive thousands of communications, publications, representations, statements, electronic transmissions, and payments to carry out the Opioid Marketing Enterprise's fraudulent scheme.

238.    Because the RICO Marketing Enterprise Members disguised their participation in the enterprise, and worked to keep even the enterprise's existence secret so as to give the false appearance that their false messages reflected the views of independent third parties, many of the precise dates of the Opioid Marketing Enterprise's uses of the U.S. Mail and interstate wire facilities (and corresponding predicate acts of mail and wire fraud) have been hidden and cannot be alleged without access to the books and records maintained by the RICO Marketing Enterprise Members, front groups, and KOLs. Indeed, an essential part of the successful operation of the Opioid Marketing Enterprise alleged herein depended upon secrecy. However, Plaintiff has described the occasions on which the RICO Marketing Enterprise Members disseminated misrepresentations and false statements to consumers, prescribers, regulators, Plaintiff, and the Class, and how those acts were in furtherance of the scheme.

239.    Each instance of racketeering activity alleged herein was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including consumers, prescribers, regulators, Plaintiff, and the

Class. The RICO Marketing Enterprise Members calculated and intentionally crafted the scheme and common purpose of the Opioid Marketing Enterprise to ensure their own profits remained high. In designing and implementing the scheme, the RICO Marketing Enterprise Members understood and intended that those in the distribution chain rely on the integrity of the pharmaceutical companies and ostensibly neutral third parties to provide objective and scientific evidence regarding the RICO Marketing Enterprise Members' products.

240.    The RICO Marketing Enterprise Members' pattern of racketeering activity alleged herein and the Opioid Marketing Enterprise are separate and distinct from each other. Likewise, the RICO Marketing Enterprise Members are distinct from the Opioid Marketing Enterprise.

241.    The racketeering activities conducted by the RICO Marketing Enterprise Members amounted to a common course of conduct, with a similar pattern and purpose, intended to deceive consumers, prescribers, regulators, Plaintiff, and the Class. Each separate use of the U.S. Mail and/or interstate wire facilities employed by the Opioid Marketing Enterprise was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims, including consumers, prescribers, regulators, Plaintiff, and the Class. The RICO Marketing Enterprise Members have engaged in the pattern of racketeering activity for the purpose of conducting the ongoing business affairs of the Opioid Marketing Enterprise.

242.    Each of the RICO Marketing Enterprise Members aided and abetted others in the violations of the above laws, thereby rendering them indictable as principals in the 18 U.S.C. §§ 1341 and 1343 offenses.

243.    As described herein, the RICO Marketing Enterprise Members engaged in a pattern of related and continuous predicate acts for years. The predicate acts constituted a variety

of unlawful activities, each conducted with the common purpose of obtaining significant money and revenue from the marketing and sale of their highly addictive and dangerous drugs. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

244.    The RICO Marketing Enterprise Members' violations of law and their pattern of racketeering activity directly and proximately caused Plaintiff and the Class injury in their business and property. The RICO Marketing Enterprise Members' pattern of racketeering activity logically, substantially and foreseeably caused an opioid epidemic. The injuries of Plaintiff and the Class, as described herein, were not unexpected, unforeseen, or independent. Rather, as Plaintiff alleges, the RICO Marketing Enterprise Members knew that the opioids were unsuited to treatment of long-term chronic, non-acute, and non-cancer pain, or for any other use not approved by the FDA, and knew that opioids were highly addictive and subject to abuse. Nevertheless, the RICO Marketing Enterprise Members engaged in a scheme of deception that utilized the mail and wires in order to carry-out the Opioid Marketing Enterprises' fraudulent scheme, thereby increasing sales of their opioid products.

245.    It was foreseeable and expected that the RICO Marketing Enterprise Members creating and then participating in the Opioid Marketing Enterprise through a pattern of racketeering activities to carry-out their fraudulent scheme would lead to a nationwide opioid epidemic, including increased opioid addiction and overdose.

246.    The Opioid Marketing Enterprise's misleading marketing and failure to prevent prescription opioid diversion damaged Plaintiff and the Class. The Opioid Marketing Enterprise's misconduct has contributed to a range of social problems, including violence and delinquency. Adverse social outcomes include child neglect, family dysfunction, babies born

addicted to opioids, criminal behavior, poverty, property damage, unemployment, and social despair. As a result, more and more of the resources of Plaintiff and the Class are devoted to responding to the opioid epidemic.

247.   Specifically, the RICO Marketing Enterprise Members' creation of, and then participation in, the Opioid Marketing Enterprise through a pattern of racketeering activities to carry-out their fraudulent scheme has injured Plaintiff and the Class in the form of substantial losses of money and property that logically, directly and foreseeably arise from the opioid addiction epidemic. The injuries to Plaintiff and the Class, as alleged throughout this complaint, and expressly incorporated herein by reference, include costs for prescription opioid drugs manufactured, marketed, sold, or distributed by the RICO Marketing Enterprise Members as well as costs for providing healthcare and medical care, additional therapeutic, and prescription drug purchases, and other treatments for patients suffering from opioid related misuse, addiction or disease, including overdoses and deaths.

248.   The injuries to Plaintiff and the Class were directly and proximately caused by these racketeering activities because they were the logical, substantial, and foreseeable cause of the injuries to Plaintiff and the Class. But for the opioid-addiction epidemic the RICO Marketing Enterprise Members created through their Opioid Marketing Enterprise, Plaintiff and the Class would not have lost money or property.

249.   Plaintiff seeks, on behalf of itself and the Class, all legal and equitable relief as allowed by law, including, inter alia, actual damages; treble damages; equitable and/or injunctive relief in the form of court-supervised corrective communications, actions, and programs; forfeiture, as deemed proper by the Court; attorney's fees; all costs and expenses of suit; and pre- and post-judgment interest.

**B.      COUNT TWO — UNJUST ENRICHMENT**

250.    Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

251.    Plaintiff brings this Count on behalf of itself and the Class.

252.    McKinsey had a duty to take reasonable steps not to encourage the over-marketing and over-prescribing of a controlled substance known at the time to be addictive and known at the time to be a threat to public health.

253.    Rather than prevent or mitigate the wide proliferation of opioids, for years McKinsey devised, and assisted Purdue with implementing, a sales and marketing campaign, including Project Turbocharge, that would dramatically increase the amount of OxyContin prescribed and distributed to individuals across the country, many of whose prescriptions were covered in whole or in part by their health plans. In the process, McKinsey continually devised misleading claims regarding OxyContin as part of their efforts to get health care providers to write more and more OxyContin prescriptions.

254.    For McKinsey's work increasing opioid sales for Purdue in violation of McKinsey's duties, McKinsey was compensated out of Purdue's income from the sale of opioids.

255.    McKinsey therefore received a benefit from the sale and distribution of prescription opioids paid for, in whole or part, by Plaintiff and the proposed Class.

256.    This compensation for increasing the sales of Purdue's deadly products constitutes money in the possession of McKinsey that, in equity and good conscience, McKinsey ought not be allowed to retain.

257.    Plaintiff and the Class are entitled to recover damages on its unjust enrichment claim in an amount to be proven at trial.

## VIII.   JURY DEMAND

Plaintiff demands a trial by jury on all claims and of all issues so triable.

## IX.     PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands Judgment for the following relief:

**A.**      The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable Notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Class;

**B.**      Plaintiff and members of the Class be awarded compensatory damages in an amount sufficient to fairly and completely compensate Plaintiff and the class for all damages; punitive damages as provided by law; pre-judgment and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate;

**C.**      Plaintiff and members of the Class recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

**D.**       Plaintiff and members of the Class have such other and further relief as the case may require and the Court may deem just and proper.

DATED      June 21, 2021              Respectfully submitted,


/s/ *George H. Faulkner*
George H. Faulkner (Ohio #0031582)
Joseph C. Hoffman, Jr. (Ohio #0056060)
Jonah D. Grabelsky (Ohio #0089009)
**Faulkner, Hoffman & Phillips, LLC**
20445 Emerald Parkway Dr. Ste. 210
Cleveland, Ohio 44135
(216) 781-3600
faulkner@fhplaw.com
hoffman@fhplaw.com
grabelsky@fhplaw.com


Joseph H. Meltzer (*pro hac vice* admission pending)
Darren J. Check (*pro hac vice* admission pending)
Terence S. Ziegler (*pro hac vice* admission pending)
Jordan E. Jacobson (*pro hac vice* admission pending)
**Kessler Topaz Meltzer & Check LLP**
280 King of Prussia Road
Radnor, PA  19087
610-667-7706
jmeltzer@ktmc.com
dcheck@ktmc.com
tziegler@ktmc.com
jjacobson@ktmc.com